WINDSOR THEATRE CO. v. WALBROOK AMUSEMENT CO. et al. (two cases).

Nos. 4230, 4292.

United States District Court
D. Maryland, Civil Division.

Oct. 31, 1950.

J. Purdon Wright, W. Frank Every, Baltimore, Md., Robert E. Sher, Washington, D. C., for defendants.

CHESNUT, District Judge.

These two cases involve the exhibition of motion pictures in Baltimore City. They are private civil suits based on the Federal Anti-Trust statute. In one suit an injunction is prayed and in the other, a large amount of pecuniary damages is sought. Both deal with a particularly local situation only.

The plaintiff owns and operates a motion picture theatre in the 3100 block of West North Avenue in Baltimore, about four miles from the business center of the City. The two defendants are Maryland corporations operating motion picture theatres in the same block. The plaintiff, The Windsor Theatre Company, owned and controlled by Morton Rosen, was a comparative newcomer in that particular neighborhood, the theatre being opened in November 1941; the stocks of the defendant corporations were wholly owned by Thomas Goldberg and his wife. He was the chief executive of both. He has owned and operated the Walbrook Theatre since about 1918. It is a first-class neighborhood picture house with seating capacity of 967. The Hilton Theatre was many years ago operated by Goldberg under the name of the Goldberg Theatre. For some years its theatre activities were abandoned but it was reconstructed early in 1941 under the name of the Hilton Theatre. The Hilton Theatre is also a first-class neighborhood theatre but its seating capacity of 556 is less than that of the Walbrook.

These suits were filed respectively on November 19, 1948 and January 6, 1949. In January 1950, shortly before the trial of the cases, the defendant Thomas Goldberg suddenly died and, on motion, his executors have been substituted by order of court in case No. 4292 involving property matters, and also on motion substituted without prejudice in case No. 4230 praying for an injunction.' Barnes Coal Corp. v. Retail Coal Merchants Ass'n et al., 4 Cir. 1942, 128 F.2d 645.

Bernard L. Rosen, Paul F. Due, Baltimore, Md., Harold L. Schilz, John F. Clagett, Washington, D. C., for plaintiff.

The essence of the lengthy complaint in these cases is the allegation that from 1941 up to the filing of these suits or shortly before, the defendant corporations conspired with seven of the eight major motion picture distributing corporations to restrain interstate commerce by refusing to license their copyrighted motion picture films to the plaintiff. None of these distributors are named as defendants in these cases but they are alleged to have been co-conspirators with the defendants. During the trial of the cases which lasted five days, counsel for the plaintiff in effect conceded that there was no evidence at all of conspiracy, between the conspirators inter sese, but does contend the evidence shows the following conspiracies:

1. Six separate conspiracies between the defendants, the Walbrook and Hilton Theatres, and the following six distributors: Metro-Goldwyn Mayer (Loew's), Paramount, Warner Bros., 20th-Century Fox, United Artists and Universal Films, one with each.

2. It is also contended that there was evidence tending to show a joint conspiracy between the defendants and four of these distributors, to wit, Warner Bros., 20th-Century Fox, United Artists and Universal Film Exchanges.

3. A conspiracy between the two defendant Maryland corporations.

After careful consideration of all the evidence in these cases I have concluded that there is no merit in any of these contentions. At the request of counsel for the parties I have made separately stated extended findings of fact with brief conclusions of law. Very much of the evidentiary facts so included, more particularly at the request of plaintiff's counsel, seem to me to be both separately and collectively really inconsequential and lacking in probative force to establish the existence of a conspiracy. In my view of the facts of these cases and the law applicable thereto, the material facts can be comparatively briefly summarized.

1. The exhibition of motion pictures in Baltimore City has for some years past followed a well-established customary pattern. There are eight (8) major producing companies. The picture films so produced by them are copyrighted and the motion picture theatres in Baltimore City are licensed by the producers to exhibit the films. Presently the custom seems to be that there is a separate license, contract or agreement for each film to be exhibited. Each producing company enters into contracts with the respective motion picture theatres for the exhibition of their pictures. The contracts with the so-called down town theatres usually provide that the pictures exhibited by them will not be licensed by the producer for exhibition in other motion picture theatres in Baltimore City until after a certain interval of time, say 21 days, which is called the "clearance" time. After that time the same pictures may be licensed to theatres remotely situated from the down town area, called "neighborhood theatres". The theatres involved in these cases are in the latter category. There is a further custom that the so-called neighborhood theatres which are so closely situated that they are said to be in a particular competitive area with respect to their customer patronage, do not exhibit the same pictures concurrently. Thus for instance, if a particular picture is licensed to be exhibited at the Walbrook Theatre on certain days the licensor would not also license the Windsor Theatre to exhibit the same picture at the same time. So with respect to two neighborhood theatres in the same competitive area there may be clearance time between them with regard to the same picture. Accordingly, the time for exhibition of a particular picture in the down town theatres is called the first run; the first exhibition of the picture in a neighborhood theatre is called the first-neighborhood-run, and the neighborhood theatres in the competitive area would have what is called a second-neighborhood-run for the particular picture.

These customs of the industry were discussed in an extended opinion of this court in 1940 in the case of Westway Theatre v. 20th Century-Fox Film Corp. et al., D.C., 30 F.Supp. 830, affirmed without further opinion by the Fourth Circuit, 113 F.2d 932.

2. The Walbrook Theatre has been continuously successfully operated since 1918 under the same management. During that time it has done business with all the leading film producers (except possibly Columbia) and has been, at least until recently, an entirely satisfactory customer. The corporate stock of both the Walbrook and the Hilton Theatres were wholly owned by Thomas D. Goldberg and his wife. In prior years he had operated what is now the Hilton Theatre under the name of the Goldberg Theatre. For some years prior to 1940 that theatre had been discontinued and the building used for other purposes; but early in 1941 it was re-equipped as a theatre and had been continuously operated over the last ten years at a moderate profit, including salaries to Goldberg, of about $2,000 a year on the average. The Hilton Theatre was not really a competitor of the Walbrook because in general it exhibited a different class of pictures. Only the better class pictures called "feature films" or sometimes "Class A" pictures were exhibited at the Walbrook while the less expensive pictures called "B" pictures were generally exhibited at the Hilton. Plaintiff calls the Hilton Theatre a "fighting theatre", but I see no particular significance in this term in view of the evidence which shows that the Hilton Theatre was in fact operated at a profit and was in substance not a competitor either of the Walbrook or the Windsor Theatres.

3. In 1941 Morton Rosen, the proprietor of the Windsor Theatre, decided to build a new picture theatre in the same block where the Walbrook and Hilton Theatres were situated. Goldberg aggressively tried to oppose Rosen's project. He opposed the passage of a City Ordinance for the new theatre. He also unsuccessfully tried to enlist the opposition of a neighborhood association. He made derogatory statements regarding the new venture and its chances of success and in other ways possibly to be described as unethical or unfair business tactics, sought to discourage the successful completion of Rosen's plans. But with relation to the charge of the conspiracy with the producing film companies this attitude of Goldberg seems really immaterial because no one of the film producing companies charged as conspirators with Goldberg had any connection with or, so far as the evidence goes, any knowledge of these activities of Goldberg.

4. Rosen was successful in completing his venture and the operations of the new theatre called The Windsor began in November 1941. Some time prior thereto and in preparation for the opening of the theatre Rosen wrote to practically all the film companies stating his desire to buy their pictures for exhibition. At least two of the major distributors, Columbia and United Artists, at once willingly sold their pictures to him but most of the remaining producing companies who had for many years past dealt with Goldberg as a customer and found their business relations satisfactory, did not consider it good business to give up an old and successfully tried customer for a new and unproved one. In so doing they acted independently and in no way collectively and the only motive actuating each of them separately was their ordinary business interests in exercising their lawful right to select their customers. No one of the producing companies which thus continued its previously established business relations with Goldberg had any financial interest in his corporations or any motivation with respect to his business other than their own respective business interests. Some of these companies were quite willing to sell their pictures to Rosen for a so-called second-neighborhood-run, that is, after the pictures had been first exhibited by Goldberg, but Rosen was in general not interested in purchasing them on that basis because he wished to conduct his business as a neighborhood-first-run theatre. After continuing for a year or two in selling first-run pictures to Rosen, United Artists decided to divide their product between Goldberg and Rosen, but this was not satisfactory to the latter and his business relations with that producer were discontinued for some years. Nevertheless the Windsor Theatre has continued in presumably successful operation to the present time. A statistical tabulation put in evidence by the plaintiff shows that roughly calculated on an average during the ten-

years period the Windsor Theatre has at various times exhibited from one-fifth to one-third as many pictures as the aggregate amount exhibited by the Walbrook and Hilton. Rosen's complaint in these cases seems to be that if he had had more feature films for first-run from some of the companies his theatre might have earned more money.

In February 1947 the statutory three-judge court filed its opinion in the well-known case of United States v. Paramount Pictures, et al., which had been pending long theretofore in the Southern District of New York. See D.C., 70 F.Supp. 53, and prior opinion in D.C., 66 F.Supp. 323. In that case under the particular facts the court among other things said that the film producing companies in the case should be required to license their exhibition rights to the motion picture theatres on a basis of "competitive bidding" for various films. Pending the outcome of the appeal to the Supreme Court the decree in this respect at least was stayed. And as a result of the appeal, that feature of the decree was reversed by opinion filed in May 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. It is not surprising that the pendency of this important litigation created uncertainty and confusion with respect to the motion picture industry; and this is illustrated by some of the evidence in the instant cases. For a time it appeared that some of the major producers felt that they must discontinue their prior course of dealings with the theatres and substitute therefor competitive bidding from theatres with respect to each film, that is to say, invite bids from the several theatres on a competitive basis, instead of making contracts with the theatres for each film on the basis of a flat sum to be paid for exhibition rights for a certain period of time, or for a percentage of the gross receipts realized by the exhibitor from exhibiting the particular picture. A number of the producers in these cases instituted this change with the Walbrook and Windsor. However, after a substantial period of experience with this new system, and especially after the reversal by the Supreme Court as to its requirment in the Paramount case, this competitive system was generally discontinued as it was found inconvenient and unworkable in practice. And some at least of the major companies in these cases returned to their former basis of business dealings with the Walbrook and Windsor Theatres. Shortly thereafter, and apparently upon counsel's understanding of the Paramount case, the Windsor Theatre instituted suit in Washington, D. C., against Goldberg and his corporations, and some of the major producers. Goldberg and his corporations successfully moved to dismiss the suit against them on the ground of venue and apparently in consequence thereof the Windsor Theatre then filed the instant suits here against the Walbrook and Hilton corporations and the Goldbergs, and therein charged joint conspiracy with the producers as above stated. But before either the Washington case against the producers or these cases against the Goldbergs and their corporations were reached for trial, the producing companies sued in Washington preferred to get rid of the litigation by again changing their sales policy with regard to Goldberg and Rosen by each selling one-half of their respective product to the Walbrook Theatre and one-half to the Windsor Theatre; and this is the situation presently existing. That and the recent death of Thomas Goldberg seem to make academic only the injunction suit here involved, leaving only the effort on the part of Rosen to recover large damages against the defendant corporation or Goldberg's estate, or both.

■ 5. There is no evidence tending to show any conspiracy or concerted action by the distributors; that is, there is no "horizontal" conspiracy in these cases. To some extent it may be said that some of the distributors have much of the time acted similarly with respect to Rosen and Goldberg; but similarity of action under substantially like circumstances affecting each distributor is not proof of conspiracy. This was discussed at some length in the Westway case, supra, and need not be repeated here. Nor do I find any "vertical" conspiracy, that is, unlawful agreement between Goldberg and any one of the distributors.

6. The evidence in this case does not show the existence of any of the features which were involved in some of the other cases affecting the motion picture industry.[1] Thus there is in these cases no point whatever with respect to "price fixing" nor was there "block booking", nor was there any "affiliation" between any of the distributors and Goldberg's companies. Nor was Goldberg the owner or proprietor of any chain or circuit of theatres. Besides the Walbrook and Hilton he had one other theatre in Baltimore, a small theatre called the Harford, situated several miles away from the Walbrook. Rosen also had one or more other theatres in Baltimore, not involved in this case. Goldberg had no buying power to put him in any special business relation with the distributors; and the evidence shows that he never attempted to exercise any such actual or pretended power although there is some evidence to the effect that at various times he complained to the distributors that in bargaining with them for picture licenses they were using the competitive basis of the Windsor adversely to him. Prior to 1941 Goldberg's business relations with the distributors apparently were entirely harmonious but after the advent of the Windsor Theatre he was in apparent conflict with them either in actual or threatened litigation at several times. Nor is there any substantial evidence in these cases of an attempt on Goldberg's part to "engross" the business, that is to say, buying more pictures than he could use for the purpose of preventing the Windsor from getting them. On the contrary, the evidence is to the effect that his theatres at times needed more pictures than they could procure. In short, the evidence is satisfactory that Goldberg's activities, persistent and aggressive as they at times appeared to be from his letters, were only in trying to the best of his ability to obtain a product sufficient for his theatres. After the distributors changed their sales policy by dividing their product of better class pictures between the Walbrook and Windsor, the gross receipts of the Walbrook have declined substantially (about 40%) probably due to inability to obtain enough first rate pictures. With respect to the distributors the affirmative evidence satisfactorily shows that they were dominated and affected in their relations with Goldberg only by reason of ordinary business motives. Their judgment as to their best business interests seems to have been confirmed by the fact shown in the defendants' evidence that as to most of the distributors during the period of competitive bidding above mentioned when the two theatres were on a comparatively comparable basis, the Walbrook Theatre produced larger returns to the distributors than did the Windsor.

In appraising the probative value (or lack of it) of the evidence of conspiracy offered by the plaintiff, certain considerations arising from the perspective of the case as a whole, should be borne in mind. There is no direct evidence of any conspiracy here by anybody. Plaintiff's case is based on the supposed force of particular items treated collectively. For the most part these relate to disconnected incidents consisting of a sentence here and there in letters written by Goldberg or orally related fragments of conversation between Rosen and local or district salesmen of some of the distributors. It would be tedious and prolix to discuss in detail each of these numerous items of evidence tendered by the plaintiff. They are represented by about 25 exhibits, mostly Goldberg's letters. Apparently plaintiff's counsel were given leave without opposition to examine defendants' whole correspondence file over a peroid of ten years and they extracted therefrom such letters as they thought would have some tendency to prove their charge of conspiracy. With one exception to be hereafter noted, they are, I think, inconsequential on the issue as to conspiracy in view of the perspective of

1. Other than the Paramount case, recent cases in the Supreme Court affecting the motion picture industry are United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160; United States v. Griffith, 1946, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; Schine Theatre, Inc., v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245, and Bigelow v. RKO Pictures, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

the cases as a whole. Some of the incidents refer to misunderstandings or supposed suspicious actions with respect to particular pictures. The few instances of this that occurred were readily explained with innocent import by the defendants' testimony. That there should be such incidents is not surprising when we remember that the whole period covered is ten years and that the Walbrook Theatre changed its exhibited pictures two or three times a week. While many hundreds of pictures are produced by the distributors during the year, there is a comparatively limited number of the so-called feature pictures. Naturally Goldberg wanted to buy as many of these as he could to supply his theatres. Another consideration to be borne in mind is the presence or absence of motivation on the part of Goldberg or the distributors for a conspiracy. So far as Goldberg is concerned, it may be inferred from his very aggressive and possibly at times unethical business conduct, that if he had had the power to conspire with the distributors to monopolize their product to the detriment of Rosen, he might have been motivated to do so. But there was no such motivation on the part of the distributors. On the contrary it would seem that the considerable amount of litigation which has prevailed heretofore against them, would have impressed their business judgment with the great desirability of no such entangling alliance, especially with a comparatively small theatre proprietor like Goldberg.

The only specific item of evidence that I think worthy of discussion in this connection is the so-called agreement of July 3, 1945 between Goldberg and each of the four distributors separately. The material facts with regard to this are set out in some detail in paragraph 20 of the findings of fact. In substance, however, the point as to this is simple. The Ambassador Theatre, owned by the Durkee interests and referred to in the Westway case in this court, was situated about a mile or two from the Walbrook Theatre. For some time prior to 1945 it had been exhibiting pictures on a first-neighborhood-run but with clearance of seven days over the Walbrook. Goldberg complained about this to the distributors and threatened to sue them for damages for licensing their pictures to the Ambassador with this clearance over the Walbrook. He contended that the two theatres were not in a competitive area and therefore it was unfair to make the Walbrook in substance a second-run neighborhood house with respect to the Ambassador. To avoid litigation each of the four distributors, including 20th-Century-Fox Films, agreed to discontinue this clearance in favor of the Ambassador. Thereupon Goldberg executed separate releases of his claims for damages to each of these four distributors. The terms of the release made no reference to the Windsor Theatre. When, in 1948 and after the Paramount case above referred to, Fox Films decided to change its sales policy with respect to the Walbrook and Windsor by dividing its feature pictures between them, Goldberg instituted suit in Washington against Fox Films seeking an injunction to prevent carrying out of the new sales policy and claiming that it would be contrary to the purpose and intent of the release of claim for damages dated July 3, 1945. Fox answered denying any such intent or purpose of the agreement. The Windsor Theatre intervened in the case on the ground that its interests were involved in the sought for injunction. Fox then filed a counterclaim seeking a declaratory judgment as to its right in licensing its films. In a pretrial settlement of the issues by the trial judge it was stated that the *Windsor Theatre adopted the position taken by the Fox Films.* It now takes the contrary position. The evidence in these cases satisfactorily convinces me that there was no agreement between the four distributors, either collectively or individually, with Goldberg except that which is plainly stated in the terms of the release and which had no relation to the Windsor Theatre.

In its major aspects, both of law and fact, on the issues of conspiracy, these cases are quite similar to the Westway case, supra. As that case was affirmed by the Court of Appeals of this Fourth Circuit, it is obvious that as a precedent it should

be followed in the instant cases, unless it has been in effect overruled in some subsequent case by the Supreme Court. Counsel for plaintiff here contend that this has been done by the Supreme Court in the case of United States v. Paramount Pictures et al., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. An examination of that case in the Supreme Court will show that it dealt with a factual situation very different indeed from the much simpler and customary business situation involved in the instant cases. Nor do I find any principle announced by the Supreme Court in that case which is in conflict with the view of the applicable law taken in the Westway case. It will appear from the first headnote in the Paramount case that the court was dealing with a suit brought by the United States "to restrain violations of §§ 1 and 2 of the Sherman Act [15 U.S.C.A. §§ 1, 2] by (1) five corporations which produce motion pictures and their respective subsidiaries or affiliates which distribute and exhibit films and own or control theatres, (2) two corporations which produce motion pictures and their subsidiaries which distribute films, and (3) one corporation engaged only in the distribution of motion pictures." The trial court held on the facts that there was a "horizontal" conspiracy between all defendants and between each distributor defendant and its licensees, which resulted in exhibitors being required to charge substantially uniform admission prices. The district court also found that there was a conspiracy to restrain trade by imposing *unreasonable clearances*. The case also involved the practice of distributors in so-called "block booking". As previously has been pointed out, the evidence in the instant cases does not justify a finding of horizontal or vertical conspiracy. There is no element of price fixing involved nor of block booking; nor, in my opinion, is there any basis in these cases for holding that such clearances as were involved in the licensing of pictures to the Walbrook over the Windsor, were unreasonable or beyond what was reasonably necessary to protect the licensee. As I understand the Paramount case, clearances which are imposed only for that purpose and to that extent were not disapproved by the Supreme Court.

In the setting of facts in the Paramount case the trial court required the film producers to put into effect a system of "competitive bidding"; but the Supreme Court reversed that provision of the decree. Without undertaking to review the Paramount case in greater detail, I think it is sufficient to say that I find nothing in the opinion in the case to sustain the plaintiff's position in the instant cases. The crucial question here is conspiracy vel non. To the extent that clearances are here involved at all, it is clear that they are certainly not less reasonable than in the Westway case. And in this connection it may be noted that on the point of clearances the opinion of the trial court in the Paramount case approved the holding in the Westway case and that view was not disapproved by the Supreme Court.[2] It is inferable that the discussion in the Paramount case with regard to what constituted reasonable clearances and the possible uncertainty of its application, caused the producing companies sued by the Windsor Theatre in Washington, D. C., to change their selling policy as between the Walbrook and the Windsor Theatres. But I do not find or infer from this fact and

2. The Westway case has also been considered in numerous other comparatively recent federal decisions involving the motion picture industry. I have not found that it has been disapproved. See United States v. Paramount Pictures, Inc., et al., D.C.N.Y.1947, 66 F.Supp. 323, at page 341; Mid-West Theatres Corp. v. Cooperative Theatres, D.C. Mich.1941, 43 F.Supp. 216, at page 221; Dipson Theatres v. Buffalo Theatres, D. C.N.Y.1941, 86 F.Supp. 716, at page 725; Goldman Theatre v. Loew's, Inc., 3 Cir. 1945, 150 F.2d 738, at page 741; Ball v. Paramount Pictures, Inc., et al., 3 Cir. 1948, 169 F.2d 317 at page 321. See also for principle involved as to reasonable clearances, the following very recently decided cases: Bordonaro v. Paramount Pictures, Inc., 2 Cir., 176 F.2d 594, 596; Meiselman v. Paramount Pictures, Inc., D.C.W.D.N.C., 86 F.Supp. 554.

from all the evidence in these cases that that change of policy showed that there was any conspiracy between the distributors and the Walbrook Theatre which had theretofore occurred.

The final contention of the plaintiff is that even if the distributors were not co-conspirators, nevertheless there was a conspiracy between the two defendant corporate theatres. This needs little discussion. Corporations can act only through their officers and agents and, of course, two corporations acting through two or more officers or agents may be guilty of a conspiracy. But it is elementary that there can be no conspiracy unless there is a meeting of two or more minds. In this case there is no evidence that the activities of the two defendant corporations were directed or caused by any one other than Thomas Goldberg who was the president and chief executive of both corporations. While his wife owned the stock of both corporations with him jointly, there is no evidence that she had any active participation in the management of the theatres. Nor is there any evidence that other officers or agents of either corporation had any conscious participation in Goldberg's competitive activities. It therefore needs no extended discussion or citation of authorities to show that there could have been no conspiracy of the two corporations on the evidence in this case. Nevertheless authorities quite precisely to that effect are to be found. 58 C.J.S., Monopolies, § 21a at page 981; Union Pacific Coal Co. v. United States, 8 Cir., 173 F. 737, at page 745; United States v. Santa Rita Store Co., 16 N.M. 3, 113 P. 620. The cases cited by counsel for the plaintiff, General Motors Corp. v. United States, 121 F.2d 376, certiorari denied 314 U.S. 618, 62 S.Ct. 105; 86 L.Ed. 497; Nash v. United States, 229 U.S. 373, 378, 33 S.Ct. 780, 57 L.Ed. 1232, and American Medical Ass'n. v. United States, 76 U.S.App.D.C. 70, 130 F.2d 233,

Id., 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434, are clearly distinguishable on the facts as in each case the corporations had two or more agents or officers.

Plaintiff's contention that Goldberg's aggressive competitive activities constituted monopoly or an attempt to monopolize business, seems to me fanciful on the evidence. It appears to be an effort to unduly magnify small and possibly unethical business competitive practices into an offense against the United States under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. See the comment by Mr. Justice Holmes in the Nash case, supra, 229 U.S. at page 378, 33 S.Ct. 780. Goldberg had no buying power sufficient to enable him to restrain commerce or to make any appreciable attempt to monopolize trade in motion pictures. His activities were directed towards advancing only his own business interests in procuring sufficient pictures for his theatres. As counsel for the defendants has well pointed out, the substance of this case is simply this. Two theatres directly across the street from each other were in active competition. Each distributor had to do business with one or the other on first availability of pictures in the zone. Some of the eight major distributors preferred to do business with the plaintiff but the majority preferred to continue their long previously satisfactory business with the defendants. In doing so they exercised what I understand still to be clearly their undoubted and important right to select their customers. In doing so they were actuated only by the ordinary business motives of making more money from pictures from an established customer owning a larger and more productive theatre.

For all these reasons I conclude that the complaint in both cases must be dismissed with costs. Counsel may submit the appropriate orders in due course.