### G. & P. AMUSEMENT CO. v. REGENT THEATER CO. et al.

No. 26311.

United States District Court
N. D. Ohio, E. D.

Sept. 8, 1952.

454

Samuel T. Gaines, Cleveland, Ohio, for G. & P. Amusement Co.

Jerome N. Curtis, B. D. Gordon and C. R. Berne, Cleveland, Ohio, for Regent Theater Co., a corporation, Cranwood Theater Co., a corporation, Cinema Service Corp., a corporation, East Shore Theater Co., a partnership, Paul Gusdanovic, Cooperative Theaters of Ohio, Inc. and Milton A. Mooney.

Luther Day, Thomas M. Harman, John S. Pyke, Cleveland, Ohio, for Warner Bros. Pictures Distributing Corp., Twentieth Century Fox Film Corp., Universal Film Exchanges, Inc. and Loew's Inc.

FREED, District Judge.

Plaintiff claims treble damages in a sum exceeding one-half million dollars sustained by it as a result of the defendants' charged violation of Sections 1, 2 and 7 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., and Sections 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 1, 2, 15 and 26. The assailed activities are alleged to have taken place over a period of years from the latter part of 1937 through the early portion of 1950. The intervention of a jury was originally demanded, but was later waived. During a protracted trial, voluminous testimony was presented, and a great number of exhibits were introduced. Extensive briefs were then filed, argument had, and the cause was submitted to the Court.

The plaintiff company from October 1, 1937 to March 18, 1950 was engaged in the exhibition of motion picture films at the Moreland, a neighborhood theater in Cleveland, Ohio. The defendants Warner Bros. Pictures Distributing Corporation, Twentieth Century-Fox Film Exchanges, Inc., Universal Film Exchanges, Inc. and Loew's, Inc. (distributor-defendants) are major film distributing companies which have been engaged in the distribution of their product throughout the United States and elsewhere, including Cleveland, Ohio. The defendant, Cooperative Theaters of Ohio, Inc. (Cooperative) has represented theater owners in Northern Ohio in the procurement of films from the various film distributing companies, including those named as defendants in the complaint. Milton A. Mooney has been the president and principal stockholder of Cooperative. Paul Gusdanovic has been the president and chief executive officer of the exhibitor companies named in the complaint, including the Regent Theater Company which has operated the Regent, a theater located in the same competitive neighborhood as the Moreland.

Briefly stated, plaintiff contends that the evidence demonstrated that the distributor-defendants conspired in a concerted plan or method of business dealing whereby they all extended a preference to the Regent over the Moreland in the distribution of their films. The conspiracy, according to the plaintiff, was built on Cooperative's exertion of its monopoly buying power in its negotiations for product for the Regent, one of the theaters represented by it. To be more specific, plaintiff says that Cooperative used its influence garnered from its representation of noncompetitive theaters as a medium of gaining concessions from the distributor-defendants for the Regent, which was in competition with the Moreland. It is urged that the distributor-defendants, thus, gave aid and comfort to,

and participated in, an unlawful conspiracy the purpose of which was to deprive the Moreland of sufficient prior run product to compete with the Regent on an equal basis. The plaintiff argues that, had it not been for the alleged conspiracy, the Moreland would have been afforded access to the prior run film market to an extent at least as great as that enjoyed by the Regent.

All of the defendants specifically deny that they participated in any such conspiracy. The distributor-defendants assert that the evidence proved they were moved to grant preference to the Regent over the Moreland solely by the fact that the Regent was an old and established customer with which a satisfactory business relationship had existed over a period of years and from which they believed they would, over the years, realize greater revenue. They say that the plaintiff has failed to prove the existence and wrongful use of the monopoly buying power claimed to have been possessed by Cooperative; that there was complete and utter failure of proof that the monopolistic practices charged in the complaint caused any damage to the plaintiff, but that business losses, if any, which the plaintiff may have suffered, resulted from independent factors not chargeable to the defendants.

The defendants take the position that no recovery may be had unless the plaintiff established (1) that Cooperative actually possessed the monopoly buying power which is attributed to it and that it was capable of exercising that power in such a manner as to cause the distributors, independent of other considerations, to prefer the Regent over the Moreland; (2) that such buying power was, in fact, so exercised; (3) that the distributor-defendants did succumb to the dictation of Cooperative and "nuckle under" the power of Cooperative and further that they did acquiesce in the alleged conspiracy; (4) that as a direct and proximate result of such wrongful conduct by the defendants the plaintiff was injured in its business; and (5) the actual amount of the damages sustained. There can be no question that these are the necessary prerequisites for a finding for the plaintiff. And plaintiff does not dispute it.

There is no substantial disagreement between the parties as to the general principles of law applicable here. In fact, both plaintiff and defendants cite the same adjudicated cases in support of their respective contentions. They part company, however, when they seek to apply the well-established principles of law to the facts developed by the testimony. Possibly no segment of business conduct has been a more prolific subject of litigation under the Sherman Act than that involving the system of film distribution in the "movie" industry. The pattern of proper and improper activity has been carefully carved out by the innumerable decisions in the field. The real controversy in this case is factual, rather than legal in nature, and the existence or nonexistence of an unlawful conspiracy and the extent to which it produced the alleged damages must be resolved on the basis of the facts adduced.

The plaintiff, both at the trial and in its brief, sought, by the constant reiteration of certain descriptive terms applied by the courts to practices denounced in prior decisions, to pour the facts of this case into the mould of the decided cases. The Supreme Court condemned the devices of "blanket deals"[1] and "circuit booking"[2] and specifically approved "theater by theater"[3] and "picture by picture"[4] transactions

---

1. Generally understood to be a single agreement for the licensing of a particular film or group of films in a number of theaters.

2. Generally understood to be the licensing of films by a blanket deal through a centralized booking agency which represents a number of theaters referred to collectively as a "circuit".

3. Generally understood to be a method of licensing films requiring a distributor to deal with each theater individually whether or not that theater is represented by a centralized buying agency or is a member of a "circuit".

4. Generally understood to be a method of licensing films whereby a distributor is required to consider each film separately for each theater without reference to whether or not that distributor is dealing for a number of films with a single agent representing a group of theaters.

as the proper method of conducting film licensing negotiations. United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; Schine Chain Theatres, Inc. v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160. By the repetitive use of such phrases, among others, plaintiff attempted to show defendants' adherence to censured practices and their nonadherence to approved practices. But the mere reference to defendants' business activities by those descriptive terms, of course, does not demonstrate that they were the same as those condemned or different from those approved in the decided cases. Each case must be regarded as having determined the legality or illegality of particular conduct only in respect of the fact situation under consideration. In that connection it must be borne in mind that this is not a suit for an injunction wherein the Government appeals to the court to restrain the continuance of monopolistic practices. Nor is this a private action to enjoin an attempt to monopolize, but a suit to recover not threatened or potential, but actual damages caused by the accomplished monopolization and the effect of a conspiracy to restrain trade. The difference in the two types of actions and the character of convincing evidence required in each case is so obvious that no further elaboration is necessary.

The Regent Theater was constructed in 1920 in a neighborhood inhabited principally by people of Hungarian descent. The Moreland was built in 1927, across the street and about one block east of the Regent. In 1927 Gusdanovic acquired a partnership interest in and virtual control of the Regent. Gusdanovic, almost from the very outset of his operation of the Regent, faced the possibility of competition from the newly constructed Moreland. At its inception the Moreland was controlled by a company formed by Universal Pictures Corporation and a Cleveland physician who made a hobby of operating motion picture theaters. However, in 1928 the Variety Amusement Company, headed by one Meyer Fine, an experienced entrepreneur, obtained a lease on the Moreland. Fine commented that, at the time he took the lease, he recognized the Moreland as a "bad theater", but that he concluded the deal as a manner of "getting rid" of another theater which he considered to be an even greater business risk. Fine operated the Moreland for a period of about one year, during which time he lost an average of about $500 per week. He contacted Gusdanovic, expressed the view that both theaters were losing money and offered to sell his interest in the Moreland to Gusdanovic. An agreement was concluded on October 1, 1929 whereby Gusdanovic acquired Fine's lease, the sale resulting in a substantial loss to Fine.

Upon his acquisition of the Moreland, Gusdanovic operated it in conjunction with the Regent. For the first two months he exhibited two feature films per week at the Moreland. However, according to Gusdanovic, business was so poor that he was forced to close the theater in December, 1929. Several weeks later he reopened it, showing Hungarian films only. All in all, throughout the early thirties, the Moreland was closed for about two years for lack of patronage.

In December, 1932 Gusdanovic accepted a five year renewal of the Moreland lease. Included in the renewal contract was a requirement that the theater be kept open an average of two days weekly from September to May. He continued to operate the Moreland in compliance with the terms of the renewal agreement, sometimes renting the theater to a Hungarian stock company and other times to political organizations for their meetings. When the lease terminated in 1937 the landlord demanded an increased rental and a provision requiring the theater to be kept open seven days per week as a condition to renewal negotiations. Gusdanovic refused to meet these terms and, thus, relinquished his control of the Moreland. He asserted that his entire operation of the Moreland, from 1929 through 1937, resulted in a net operating loss of $80,000. The Regent, on the other hand, during that same period of time, appears to have been operated as a somewhat more successful venture. Further refer-

ence to the comparative operations of the two theaters will be made later.

The plaintiff began business in June, 1937 under the direction of Sam Greenberger and Dave Polster, both of whom had been motion picture exhibitors for many years. In October, 1937 it acquired a five year lease on the Moreland. Upon the expiration of the original term in 1942, the lease was renewed for an additional five years. In 1947 the plaintiff again renewed the lease, this time for a ten year period. However, on February 9, 1948 Greenberger and Polster sold their stock in the plaintiff corporation to four individuals named Stutz, Snyder, Mendelson and Berusch who operated the Moreland until March 18, 1950 when they were forced to close the doors. Although it was said that the Regent achieved a fair measure of success, as compared with the Moreland, during the period of the plaintiff's occupancy, the record discloses that the Regent, in fact, lost over $40,000 from 1938 through 1949.

The defendant Cooperative began business early in 1938 under the direction of Mooney. Cooperative's stated purpose, as disclosed in its articles of incorporation, was "to develop, organize and conduct a centralized system for the booking and distribution of available motion pictures." In pursuance of that stated purpose, it entered into contracts with the exhibitors throughout Northern Ohio to represent them in obtaining product from the film distributors.

Cooperative matured into a sizeable enterprise in a relatively short period of time. In 1938, the year of its inception, it represented twenty-nine theaters in and about Cleveland; in 1949 it reached its peak, representing some one hundred forty-one theaters throughout Northern Ohio. During the entire period of Cooperative's existence Mooney and the members of his family have been its sole stockholders. No exhibitor ever obtained any financial interest in it, as a stockholder or otherwise.

Cooperative merely sold its services to the exhibitors for a given weekly fee, and the film distributors billed those exhibitors directly and made monetary adjustments with the exhibitors directly. On occasions, in the early days of the Cooperative's existence, Mooney met with his exhibitor clients for the purpose of discussing common problems.

In March, 1938 Gusdanovic, because of ill health, retained Cooperative's services for his theaters, among which was the Regent. But for the brief period of time when Meyer Fine operated the Moreland, the Regent was entirely without neighborhood competition until the plaintiff acquired the Moreland in 1937. Quite naturally, therefore, the Regent had become the regular and established customer of the major film distributors. The Regent enjoyed the comfort of being entirely unopposed in its quest for second run[5] films in the neighborhood.

At about the same time that Gusdanovic retained Cooperative to negotiate for the Regent, an event of major importance to both theaters occurred. The Colony Theater opened for business in the fashionable Shaker Square business district, about one-half mile from the location of the Moreland and the Regent. The Colony was completely modern in every respect, possessed of the latest equipment and most attractive furnishings. The Colony had a sizeable parking lot, a convenience which both the Regent and the Moreland lacked.

The Colony, immediately upon opening its doors, obtained clearance over both the Regent and the Moreland in exibiting the films of the major distributors. Before the advent of the Colony, the Regent and Moreland, during brief periods in which they were actually competing with each other, had vied for the position of second run theater in the neighborhood. Now both were reduced to the status of third run theaters, showing their films forty-two

5. In Cleveland the only first run theaters are located in the downtown business area. They enjoy a certain period of clearance (generally thirty-five days) over the showing of the same picture in the neighborhood theaters, which are designated second run theaters. Quite often one neighborhood theater will have clearance over another, the latter then being designated, a third run theater.

days after the downtown theaters and seven days after the Colony.

In 1938, then, the Regent continued as the regular customer of the major distributors, but was now relegated to a third run position. For the first time in eight years, it faced competition in retaining its third run product from the Moreland, newly acquired by the plaintiff. It was at this point that Cooperative entered upon the scene as the Regent's agent for the licensing of films. Examination of the record reveals that the only significant change in the product situation between the two theaters which developed at that time was that the Regent suffered the loss of one-half the third run films of Columbia Pictures Corporation [6] to the Moreland.

In 1938 the plaintiff was likewise successful in acquiring all of the third run films of Paramount Pictures, Inc., one-half of the product of United Artists Corporation, one-half of the productions of Monogram Pictures Corporation and all of the product of two or three minor producers, all of which had formerly been licensed exclusively to the Regent. In 1946 Loew's instituted competitive bidding for films between the two theaters, thus putting Loew's pictures at the disposal of the Moreland as well as the Regent. Despite the fact that the plaintiff, as indicated above, had considerable product to play on a run prior to the Regent, there was convincing testimony during the trial to the effect that the Moreland could not exist if it were forced to play all the films of the four distributor-defendants on a run subsequent to that of the Regent. There is the focal point of this case. If the Moreland could not exist on a run behind the Regent, so also must it be true that the Regent could not exist on the same run behind the Moreland. The four distributor-defendants, as had been their custom long before the plaintiff acquired control of the Moreland, continued, with few exceptions, to grant the Regent clearance over the Moreland.

The damages claimed by the plaintiff must be viewed against the backdrop of these facts.

It may not be validly claimed that any direct evidence of an unlawful conspiracy to deprive the Moreland Theater of film product was presented. Seldom, if ever, however, will the plaintiff in an antitrust action be able to prove a conspiracy by direct evidence, for that evidence must almost certainly come from the unwilling lips of the alleged conspirators. The law is clear and citations are scarcely necessary to state the well-established postulate that in a proper situation a conspiracy in restraint of trade may be inferred from circumstantial evidence. It is not essential that the plaintiff show a specific agreement to enter into a conspiracy. It is enough to prove the "knowing participation" of the alleged conspirators in a course of action the necessary consequence of which is an unlawful conspiracy. Bigelow v. R. K. O. Radio Pictures, Inc., 7 Cir., 1945, 150 F.2d 877; see also: United States v. Griffith, supra; Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Frey & Son v. Cudahy Packing Co., 1921, 256 U. S. 208, 41 S.Ct. 451, 65 L.Ed. 892; Ball v. Paramount Pictures, Inc., 3 Cir., 1948, 169 F.2d 317; William Goldman Theatres, Inc. v. Loew's, Inc., 3 Cir., 1945, 150 F.2d 738.

The core of the plaintiff's contention is apparent. Its entire case is founded upon the inference which it has drawn from facts and circumstances added to the conduct of the defendants. It was emphasized repeatedly that the tremendous buying power of Cooperative, described by the plaintiff as a "monopoly power", coupled with similarity of action among the distributor-defendants, spell out an unlawful conspiracy to defeat the Moreland in its quest for prior run films. There is no dispute that, if the evidence, even though purely circumstantial, should disclose the existence of a monopoly power and the wrongful use of that power, this Court would be duty bound to award such damages as are proved. However, the complete and careful analysis of the record utterly fails to prove either the use of the monopoly pow-

---

**6.** Columbia was originally named as defendant, but on motion of the plaintiff was dismissed.

er of Cooperative or any concerted action on the part of the distributor-defendants.

While it is true, to a certain extent, that the distributor-defendants acted in a similar fashion in their dealings with the Moreland Theater, that accused conduct, in and of itself, falls far short of proving their complicity in a forbidden conspiracy. Milgram v. Loew's, Inc., 3 Cir., 1951, 192 F.2d 579; Windsor Theatre Co. v. Walbrook Amusement Co., D.C., 94 F.Supp. 388, 392; Id., 4 Cir., 1951, 189 F.2d 797; Westway Theatre, Inc. v. Twentieth Century-Fox Film Corporation, D.C., 30 F.Supp. 830, affirmed 3 Cir., 1940, 113 F.2d 932. As it will be again pointed out later, whatever similarity of conduct is here disclosed is indicative of nothing more than the fact that the business judgment of all the distributor-defendants prompted them to prefer to deal with a theater with which they had a long and satisfactory business relationship rather than with one which because of the vicissitudes of economic fortunes had not been a steady customer. Certainly there is nothing unlawful *per se* in the mere preference of one theater over another. Dipson Theatres, Inc. v. Buffalo Theatres, Inc., 2 Cir., 190 F.2d 951, certiorari denied, 1951, 342 U.S. 926, 72 S.Ct. 363; Windsor Theatre Co. v. Walbrook Amusement Co., supra. It must also be recognized that it is not inherently improper for a distributor to grant and for an exhibitor to accept clearance over another exhibitor, so long as that clearance is confined to a reasonable area and a reasonable duration. Schine Chain Theatres, Inc. v. United States, supra; Fanchon & Marco v. Paramount Pictures, Inc., D.C., 1951, 100 F.Supp. 84; Mid-West Theatres Co. v. Co-Operative Theatres of Michigan, Inc., D.C., 1941, 43 F. Supp. 216.

Assuming, however, that there is something sinister in the mere uniform or identical conduct of motion picture distributors, this Court is not persuaded that there was such similarity of dealing among these distributor-defendants as to warrant the emphasis that the plaintiff has given that factor. The record discloses that each of the distributors, at some time or another during the plaintiff's occupancy of the Moreland, licensed films to that theater on a run prior to the Regent. In fact, Loew's as has been previously stated, from 1946 on permitted the Moreland to bid for prior run product on an equal basis with the Regent. The plaintiff seeks to turn these matters in its favor by the repeated assertion that the Moreland, in rare instances, received preference over the Regent only when Mooney and the distributor-defendants had a falling out and that it was subjected to harsh and onerous conditions under the Loew's bidding arrangement. The evidence, however, is, at least, equally susceptible of the conclusion that the distributor-defendants were motivated in these actions solely by a desire to find an additional satisfactory outlet for their product. The record clearly establishes, the gross receipts obtained by the distributor-defendants from films sold to the Moreland were insufficient to justify any change in their policy of granting the Regent preference.

Perhaps the most vital element of the plaintiff's case is the alleged monopoly buying power of Cooperative. It was conceded that under the facts here presented, without a showing that such monopolistic power actually existed, proof of conspiracy, either vertical or horizontal, has failed. While it is true that Cooperative represented a considerable number of exhibitors who comprised the local film market, that fact does not, in and of itself, establish that Cooperative actually possessed the trade restraining potential attributed to it, nor that Mooney was, thus, enabled to "throw his weight around" to the extent necessary to cause the distributor-defendants to grant him a preferential right-of-way in local film traffic. There is nothing inherently unlawful in the acquisition and retention of a great volume of purchasing power. It is only when that power is used in such a manner as to further an unlawful restraint of trade that the wielder of the power runs afoul of the Sherman Act. United States v. Griffith, supra. Therefore, in the absence of oppressive or coercive exercise of Cooperative's admitted buying potential, the distributor-defendants were perfectly

free to exercise their general right of customer selection with respect to the Regent or any other theater similarly situated, whether or not the theater ultimately selected was represented by a film purchasing agent. That proposition finds ample support in the decisions. United States v. Colgate & Company, 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. This Court in a recent opinion had occasion to point out the existence and the inviolability of the unrestricted right of customer selection "in the absence of any purpose to create or maintain a monopoly." United States v. Lorain Journal Company, D.C., 1950, 92 F.Supp. 794, 797, affirmed 1951, 342 U.S. 143, 72 S.Ct. 181.

The plaintiff seeks to establish Cooperative's wrongful use of its purchasing power by showing that Mooney customarily, in bargaining with the distributors, joined together in a single preliminary contract theaters represented by Cooperative in "closed situations" [7] with those located in "open situations" [8]. Thus, it is claimed that Mooney was able to use the possibility of his refusal to buy in the closed market as a sword above the heads of the distributors to force them to prefer the Regent or any other theater which he represented in an open situation. This course of dealing, plaintiff argues with particular emphasis, is in direct violation of the "theater by theater" and "picture by picture" method prescribed by the Supreme Court in United States v. Paramount Pictures, Inc., supra, as the proper and lawful manner of negotiating for films.

The evidence here does not substantiate the contention that Cooperative used its representation of noncompetitive theaters to exact the preference of the Regent over the Moreland, despite the fact that Mooney often carried on negotiations with the distributor-defendants for all of Cooperative's customer theaters at one time. The mere representation by Cooperative of both competitive and noncompetitive clients, in a single negotiation, does not *per se* violate

the mandate of "picture by picture" and "theater by theater" dealing. Nor does failure to employ that formula, under all circumstances, constitute a violation of the Sherman Act. Specific practices deemed unlawful under one set of circumstances are not necessarily unlawful under another. Dipson Theatres, Inc. v. Buffalo Theatres, Inc., supra; Windsor Theatre Co. v. Walbrook Amusement Co., supra; Fifth & Walnut, Inc. v. Loew's Inc., 2 Cir., 1949, 176 F.2d 587. Assuming, however, that the Supreme Court, by its decisions in the Schine and Paramount cases, supra, did lay down an unfailing formula, that, to meet the requirements of the law, the parties must deal "picture by picture" and "theater by theater" under all circumstances and in all fact situations, the plaintiff still has failed to prove by convincing evidence that Mooney and the distributor-defendants have not dealt in the prescribed manner.

Compelling logic, in this Court's view, directly refutes the plaintiff's contention that Mooney used his closed situations as a lever in negotiating for films for the Regent in preference over the Moreland. It is to be seriously doubted that an individual theater owner in a noncompetitive situation would suffer his position to be used in a manner, which may work to his detriment, as an instrument for obtaining the preferential treatment of an exhibitor with whom he had no particular connection other than the fact that they were both represented by Cooperative. To the contrary, it is more likely that he should object vigorously to such treatment, even to the point of refusing to purchase the services of Cooperative in the future. That fact was well-known and fully realized by all the parties concerned. In this respect, it is pertinent that no individual exhibitor represented by Cooperative had any financial interest in the operation of the company as a whole.

[5] The burden of proving that Cooperative's monopoly power and the parallel action of the distributor-defendants was

---

7. A theater is said to be located in a closed situation when it has no competition in its competitive area from a theater showing films on the same run.

8. A theater is said to be located in an open situation when it has competition in its area from a theater showing films on the same run.

of such a nature as to justify a finding of damages rests with the plaintiff. During the long trial the plaintiff introduced in evidence certain excerpts from letters which were culled from the vast amount of correspondence between the district and branch managers of the distributor-defendants and their respective home offices. There was also presented testimony regarding one or two isolated conversations alleged to have taken place between Mooney and the agents of the distributor-defendants. All of these matters were introduced in an attempt to show the coercive force wielded by Cooperative and the extent to which the distributor-defendants responded to it, thus taking part in the wrongful conspiracy which led to the downfall of the Moreland. Such evidence is unimpressive. The net result of its presentation is to prove only that which has already been admitted, that Cooperative acted as booking agent for a large number of theaters and that the distributor-defendants conducted their business in a similar manner in the Moreland-Regent situation.

Time and time again throughout its argument the plaintiff directed the Court's attention to the preliminary contracts which it had offered as exhibits. These contracts, or "deal sheets", as they are called in the movie industry, are commonly used by booking agents in negotiating with the distributors for films for the various theaters which they represent. The plaintiff complains of the fact that Mooney, in his negotiations with the distributor-defendants, customarily "lumped together" all or a large number of his exhibitor clients in a single deal sheet. Here again the evidence is ineffective to prove a conspiracy. The frivolity of requiring Mooney to negotiate by means of a separate deal sheet and in a separate sitting for each of his clients is too obvious to require an extended explanation.

Further detailed recital of the reasons why the plaintiff failed to prove its contentions seems unnecessary. It suffices to say that the claimed existence and exercise of monopoly power was found in constant assertion, rather than in the proof. The accusation of horizontal conspiracy among the distributor-defendants is supported by nothing more than their continuance of similar dealing with the Regent Theater. The charge of vertical conspiracy between the distributors, on the one hand, and Cooperative and the exhibitors, on the other, is predicated almost entirely on nothing more concrete than the showing of a large volume of purchasing power in the hands of Cooperative. It is true that Cooperative did act as buying or booking agent for a large number of theaters, some of which were located in competitive situations while others enjoyed a field free of competition, but the conclusion of the existence of either a horizontal or vertical conspiracy which the plaintiff asks the Court to draw from the mere presence of those circumstances, is wholly unwarranted. This Court is firmly convinced that there is complete and utter failure of proof, that the alleged monopoly buying power and conspiracy ever existed.

To entitle plaintiff to recover, it must show that, as a direct and proximate result of the claimed wrongful acts, it has been damaged. This, in the opinion of this Court, the plaintiff has failed to show, nor is the Court convinced that the plaintiff has succeeded in showing the existence or the amount of the damages claimed.

It must have been apparent to all who operated the Moreland that the potential patronage of the neighborhood was insufficient to permit the profitable operation of two theaters. Nor could there be any hope of implementing that potential patronage by the attraction of persons residing outside of the neighborhood. As a general rule, theatergoers simply will not venture from their own immediate neighborhoods to view a second or third run "movie". From its very inception the Moreland was doomed to failure so long as the Regent sought to attract patrons to its box office across the street. It is likewise true that the Regent, if it were forced to compete with the Moreland, was bound to be a losing proposition.

From the time of its original opening the Moreland distinguished itself by nothing but a marked inability to attract patronage. As early as the regime of Meyer

462

Fine, a man well versed in the art of exhibiting motion pictures for profit and possessed of considerable buying power in his own right, the Moreland was a business failure. Yet the Moreland at that time was a newly constructed theater with the latest equipment and most modern appointments. Certainly, if it had been possible for both the Regent and the Moreland to have been operated with any degree of success, that possibility would have been demonstrated during the period of time when both theaters were under the guidance of Gusdanovic, and yet Gusdanovic's uncontradicted testimony shows a net operating loss of $95,000 from the combined venture. What can be more convincing than the failure of a man of Gusdanovic's ability in his field to show a profit on this type of enterprise? That Gusdanovic, as is urged upon this Court by the plaintiff, acquired control of the Moreland solely for the purpose of insuring the Regent against competition from that quarter defies the belief of skilled and unskilled business minds alike. Conceding for the purpose of discussion only, that Gusdanovic did assume control of the Moreland for the avowed purpose of destroying its ability to compete with the Regent, such destruction had become an accomplished fact by the time the plaintiff acquired the Moreland in 1937. The result of Gusdanovic's alleged treachery was thus exposed to all potential purchasers of the theater, and the insistence with which plaintiff has called the Court's attention to Gusdanovic's experience with it serves only to re-emphasize the fact that, when the charged conspiracy began, the Moreland's business outlook had been so completely destroyed that the distributor-defendants were legally justified in their conduct. Even before the plaintiff appeared upon the scene, the Moreland had acquired the reputation of neighborhood "slough house", a theater given to the showing of foreign language films and off-brand releases. The plaintiff, at all times under the direction of men of considerable experience, must be held to a knowledge of that fact.

It would serve no useful purpose to set forth in detail the conclusions to be reached from the multitude of tables and auditing figures offered by both sides with respect to grossing history and potential, as well as the physical characteristics of the two theaters. It suffices to state simply that the Moreland, throughout its entire history, was a losing proposition. A great deal of testimony was offered tending to show the large sums of money expended by the Regent for maintenance and improvement, in particular the installation of an air-conditioning system, a comfort never offered by the Moreland, as compared with the much smaller amounts expended by the Moreland for the same purposes. The net effect of such testimony, though not conclusive, is favorable to the defendants, for it is indicative of the reputation which each theater had acquired among the neighborhood theater patrons. It points up one more reason why the Regent had achieved the greater amount of success in the locality.

It follows inexorably, therefore, that, regardless of its mode of operation, its physical appointments and the quality of its product, the Moreland, if it had to meet the competition of the Regent, or any other neighborhood theater, was doomed to economic failure. Conversely, the Regent was in no position to become a successful business venture if it had to attract its patrons while the Moreland was exhibiting films on the same run. The tables of figures prepared by the auditors for both parties and for both theaters clearly demonstrate the soundness of this conclusion. Under these circumstances the distributor-defendants, under the law, had an absolute right to select the Regent in preference to the Moreland. They had the right to continue to deal with an established customer, whose reliability and productivity had proven constant over the years, rather than to switch allegiance to the Moreland, which had from its very beginning a checkered and unsuccessful business existence, regardless of product, management or any other factor which might have led to success or failure.

Under no circumstances should this Court be taken as having decided that the deprivation of product plays no part in defeat-

ing the successful operation of a theater. It has held merely that the deprivation of product in this case was prompted by considerations other than the monopolistic practices and conspiracy with which these defendants were charged. Judge Chesnut, in Windsor Theatre Company v. Walbrook Amusement Company, supra [94 F.Supp. 396], well stated the situation which is applicable to this case.

"* * * Two theatres directly across the street from each other were in active competition. Each distributor had to do business with one or the other on first availability of pictures in the zone. Some of the eight major distributors preferred to do business with the plaintiff but the majority preferred to continue their long previously satisfactory business with the defendants. In doing so they exercised what I understand still to be clearly their undoubted and important right to select their customers. * * *"

■ The opportunity of a business entity, when acting without ulterior motives and free from compulsion, to sell its product to one potential customer in preference to another, exemplifies precisely the type of economic system upon which American business thrives. This Court has never regarded the Sherman Act as an instrument requiring a dealer in commodities to sell to all comers, when to do so will be to run the risk of destroying a good customer by selling to another when it is simply an economic impossibility for both to exist— provided, of course, that there is no wrongful use of monopoly power or conspiracy to restrain trade. If that were the purpose of the Sherman Act, it would be a vehicle for the destruction of business rather than a law to eliminate the road blocks to competition so as to permit business enterprises to grow and prosper. Nor does it believe that it was ever intended to be the purpose of the Sherman Act to revitalize a failing business by drawing from a successful business the substance upon which it depends so that the latter shall perish and the former shall survive. In this instance, to transmit from the Regent to the Moreland all of the product of the distributor-defendants would be to grant the Moreland a reprieve and to condemn the Regent to death. To transmit one-half of that product would result in the destruction of both theaters. To award damages to the Moreland would be to effectuate such a transmittal indirectly when to do so directly would shock one's conscience.

The careful and complete analysis of all the evidence leads to the inevitable conclusion that the plaintiff has failed to sustain the material allegations necessary to permit recovery. The facts adduced and the applicable law justify no other result. The defendants will comply with Rule 4 of the Rules of the United States District Court for the Northern District of Ohio in such a manner as to conform to this opinion.

The plaintiff is not entitled to a recovery.