**ROBBINSDALE AMUSEMENT COR-PORATION, Plaintiff,**

v.

**WARNER BROS. PICTURES DISTRIB-UTING CORPORATION,** Universal Film Exchanges, Inc., United Artists Corporation, Twentieth Century-Fox Film Corporation (a Delaware corporation), Twentieth Century-Fox Film Corporation (a New York corporation), RKO Radio Pictures, Inc., Paramount Film Distributing Corporation, Minnesota Amusement Company, Loew's Incorporated, Columbia Pictures Corporation, Minneapolis Theatres, Inc., Defendants.

Civ. No. 4584.

United States District Court
D. Minnesota, Fourth Division.

Dec. 30, 1955.

Lee Loevinger, Louise A. Herou, and Larson, Loevinger, Lindquist, Freeman & Fraser, Minneapolis, Minn., for plaintiff.

David Shearer, Minneapolis, Minn., (Shearer & Peters, Minneapolis, Minn., of counsel), for all defendants with the exception of Minnesota Amusement Company and Minneapolis Theatres, Inc.

Mandt Torrison, Saint Paul, Minn. (Bundlie, Kelley & Maun, Saint Paul, Minn., of counsel), for Minnesota Amusement Company.

Edward C. Raftery, New York City (O'Brien, Driscoll & Raftery, New York City, of counsel), and Matthew J. Levitt, Minneapolis, Minn., for Minneapolis Theatres, Inc.

NORDBYE, Chief Judge.

This cause came before the Court on a complaint filed by plaintiff under the anti-trust laws of the United States wherein it seeks an injunction and the recovery of damages.

The plaintiff corporation is the owner of a neighborhood or suburban theater located in Robbinsdale, Minnesota, called the Terrace, which was constructed between 1949 and 1951 at a cost of approximately $500,000. The stock of the corporation is owned principally by the Volk brothers, who also control and operate, by different corporations, however, other neighborhood or suburban theaters in Minneapolis called the Riverview, the Nile, and the Camden.

Robbinsdale is a suburban residential city of some fourteen thousand population which borders the north city limits of Minneapolis. It has no substantial industries or large hotels or business activities except those commonly found in the usual suburban city. Only one in ten of its inhabitants is employed in the commercial area of the city itself; the majority of its residents are employed in Minneapolis.

At the request of plaintiff, the Court personally visited the Terrace and observed the surrounding area. The theater is beautiful and well-designed. It is equipped with several modern and highly desirable innovations, such as staggered seats, a sound-proof nursery room, zone heating and cooling, a lounge, a soft drink and snack bar, and a television room for the use and entertainment of patrons who are awaiting the beginning of a feature picture or are tarrying in the theater lobby for any other purpose. In addition to these outstanding features, adequate and free parking grounds are furnished for its patrons. The theater is situated in a residental community surrounded by small and modest homes and is accessible mainly by automobile transportation. In view of the expensive and somewhat lavish construction of the Terrace in relation to its location and surroundings, one must conclude that this site for such a theater is one which is not particularly desirable.

Each of the distributor defendants is a producer and distributor of motion

picture films, with the exception of United Artists which apparently limits its distribution to motion pictures produced by others. Minneapolis Theatres, Inc., is engaged in operating the Orpheum and the Pan theaters in downtown Minneapolis. It is a wholly owned subsidiary of RKO Keith-Orpheum Theatres, Inc. The parent company operates numerous motion picture theaters throughout the Nation. The Minnesota Amusement Company is the operator of theaters in Minnesota, North and South Dakota, and Wisconsin. This exhibitor is a subsidiary of the American Broadcasting-Paramount Theatres, Inc., which controls a large national operation of motion picture theaters. The Minnesota Amusement Company, hereafter referred to as M.A.C., operates the Radio City, State, Lyric and Aster theaters in Minneapolis, which are so-called downtown theaters, and also the Uptown, the Loring, and the Rialto, which are suburban or neighborhood theaters.

Minneapolis is a city with a population well over half a million and surrounded by smaller cities and communities which have shown tremendous residential growth, particularly since the last war. But although the greatest growth in population in metropolitan Minneapolis is to be found in the suburban areas, nevertheless, Minneapolis remains a city with a hub or loop where the large hotels, department stores, banks, office buildings and entertainment places are located. Local shopping centers are springing up in the suburban areas, but Minneapolis, at least up to this time, has remained a so-called loop city where transients come to the large hotels and where people do the greater share of their shopping in the large department stores and numerous shops. And it is in the loop area that the people largely seek their entertainment, uplifting or otherwise. Since the early beginning of motion picture history, the downtown theaters, at least in Minneapolis, have been accorded the first run of the showing of the desirable pictures. The distributors expect that the downtown

showing will not only attract downtown patronage from transients and others, but also will give the picture advertising and publicity. The so-called "show case" first-run exhibition of pictures downtown undoubtedly builds the picture, not only for the suburban theaters, but for theaters in the surrounding trade area of Minneapolis as well. The first-run theaters showing the better pictures in Minneapolis are the Radio City, the State, the Orpheum, and the World. The Lyric and the Pan usually operate on first run, but generally have Class B or C pictures. These two theaters, during the period in controversy, also upon occasions have operated on pictures moved over to them from the Radio City, the Orpheum, and the State. Move-over pictures exhibited by the Lyric come from either the Radio City or the State, while the Pan plays move-over pictures which come from the Orpheum.

Since 1948, the first-run theaters in Minneapolis have been accorded a minimum 28 day clearance over all other theaters. The 28 day clearance has been applied to the Terrace, the Uptown, the Boulevard, the Riverview, the Hopkins, the St. Louis Park, the Richfield, and the Edina theaters, and perhaps others. These theaters last mentioned may be designated as neighborhood or suburban theaters. No one questions that the first showing of a picture enhances its attraction to motion picture patrons. On the other hand, it is generally recognized that first-run houses which exploit pictures under the heavy expense of advertising and a large overhead, and which are the source of the largest revenue for the distributors, are entitled to a reasonable clearance over second-run theaters which are in competition with them. Whatever the situation may be in other cities, such as Los Angeles, for instance, where there are communities within the city limits with a distinct community life of their own, Minneapolis remains a city grown populous around the proverbial downtown loop area. As illustration of the film rental paid by the first-run theaters, reference may be made to tab-

ulations computed on forty-six of the better pictures which played first run in downtown theaters during the period in controversy. The film rentals on these pictures paid by downtown theaters on first run totaled $520,178, or 59 per cent of the film rental paid by all theaters in the Minneapolis metropolitan and suburban areas. The theaters playing these pictures 28 days after close of first run downtown paid film rental of $152,674, and from all other suburban and neighborhood theaters in the Minneapolis metropolitan area, the film rental on these pictures was $205,725.

When the Terrace was being erected, the Volks began to negotiate with the defendant distributors for a better run than the 28 day availability. Their argument was that the Terrace, with its superior appointments and comfort for its patrons and therefore its potentialities for the payment of favorable film rental, entitled it to a better run than the other suburban theaters. On March 17, 1951, it requested a 14 day availability. On October 29, 1951, it reiterated its request. On April 3, 1953, it demanded an exclusive second-run playing position in Minneapolis regardless of whether that playing position was called a second run or a move-over. All of these demands were given consideration by the distributors, and so far as the evidence discloses, the replies denying plaintiff's requests were acted upon separately and independently by each distributor and without any collaboration with the first-run exhibitors or with each other.

During the trial the position taken by plaintiff was centered primarily upon its demand for an exclusive first suburban run without clearance, or, in other words, a move-over run comparable to that which had been granted to the Lyric and the Pan. Although plaintiff's exact position regarding the relief it requests by way of a better run has not been always consistent and at times merely was directed to an exclusive better run, it seems reasonably apparent that it now urges that, in that the Lyric and the Pan have been privileged with move-over runs on certain pictures, the Terrace, which is a much finer theater than either of these two and capable of producing comparable revenues and film rental, should likewise be accorded a move-over run, not intermittently and subject to a waiver by the first-run theaters, but as a matter of right on all desirable pictures it may select and thus obviate the necessity of playing a feature picture day and date with other suburban theaters. Plaintiff contends that there is a collusive arrangement between the so-called circuit theater exhibitors and the distributors whereby all the move-overs are from the Radio City or the State to the Lyric, and from the Orpheum to the Pan. It does not attack the move-over practice as such, but it contends that it should be extended so as to include the Terrace, and reasons that, if there are suburban theaters not in substantial competition with the Terrace which should be accorded the right to bid for the same run, it will take its chances on obtaining an exclusive run by reason of its ability to outbid any such theater in competitive bidding. The gross earnings of the Terrace and the film rental paid exceed that of any other suburban theater in the Minneapolis area.

A move-over run is "the privilege given a licensee to move a picture from one theatre to another as a continuation of the run at the licensee's first theatre." United States v. Paramount Pictures, 334 U.S. 131, 160, note 13, 68 S.Ct. 915, 930, 92 L.Ed. 1260; Fifth & Walnut, Inc., v. Loew's, Inc., 2 Cir., 176 F.2d 587, 589, note 2. Move-overs in Minneapolis have been accorded only to downtown theaters. Undoubtedly the purpose of a move-over is to obtain as large a revenue from a particular picture as the circumstances will permit. Therefore, if the interest in a picture by the public would seem to justify a move-over run to a theater with less overhead, but charging the same admission price as the first-run theater, the producer and the exhibitor may agree upon such procedure. However, in Minneapolis a con-

templated move-over is never advertised or disclosed to the public until the picture has been exhibited first in a first-run theater and an opportunity is thereby afforded to assay the initial public interest. A run beyond the initial week in the first-run house is usually described as a hold-over or carry-over. That an extended run of a picture downtown in Minneapolis, or a move-over run, tends to exploit and build the picture in the minds of the theater-going public, not only in Minneapolis but in the rural areas included in what is generally termed as the Minneapolis exchange area, seems indubitably clear. The Radio City Theater contains 4,000 seats and has a weekly expense of about $7,788. The Orpheum has about 2,800 seats and is operated at a weekly cost of about $5,500. The State has 2,300 seats, with a weekly expense of about $6,159. The Pan Theater has 1,418 seats, with a weekly outlay of about $3,600. The Lyric has 1,100 seats, with a weekly expense of about $3,037. The Terrace has 1,300 seats, with a weekly expense of approximately $1,800. A picture playing at the Radio City, for instance, on first run may have, after the first week, certain potential earnings on an extended run, but due to the fact that that theater will lose money if the weekly gross falls somewhat below $10,000, the exhibitor may decide to move the picture to the Lyric, where the weekly overhead is substantially lower. The fact that, in the opinion of the exhibitor, the picture has stimulated sufficient patronage to justify a move-over is heralded in the press and by marquee advertising where the downtown traffic, vehicular and pedestrian, passes by. True, it sometimes appears that while the patronage initially of the move-over theater is substantial, it dwindles noticeably during the last week of the showing. But that often the continuing trade of transients as well as other patrons, which otherwise might be lost, is garnered by a move-over seems well-established by the evidence. And therefore, when making a comparison of the box-office receipts on certain pictures moved over to the Lyric or the Pan and then thereafter played by the Terrace, consideration must be given to the fact that the last week's receipts on the move-over run merely emphasizes the law of diminishing returns on move-overs, while the evidence of first week greater returns on that picture at the Terrace over the last week return obtained in a move-over theater illustrates that many people who attend suburban theaters are biding their time and awaiting the opening of a particular picture at the suburban theaters. It is questionable that the Terrace has lost any substantial number of its patrons by reason of move-overs. Whether a picture moves over or not, the customary patrons of second-run suburban theaters know that 28 days after the last day of the showing at the first-run theater, the picture usually will be available to them at their favorite suburban theater. The Terrace customarily plays only the best feature pictures.

During the period in controversy, move-overs have not been limited only to the Lyric and the Pan. A downtown theater known as the Pix played some move-overs, and also the World and the Century, the latter two being also downtown theaters. None of these theaters was affiliated with any of the defendant exhibitors except the Century, and that theater was taken over from M.A.C. by Cinerama in 1953. The Pix was closed in the summer of 1952. The World went on an exclusive first-run policy in 1951. The Gopher, an independent downtown theater with 1,100 seats, operates principally as a first-run theater in competition with other first-run houses. Consequently, at the present time, there are only two downtown theaters available for move-overs, and they are the Lyric and the Pan. However, it may be observed that in St. Paul and Duluth, move-overs are always limited to downtown theaters, but only one, the Riviera in St. Paul, is connected with any of the so-called circuit exhibitors.

All of the distributors, with the exception of Loew's, recognize that the

move-over practice on certain pictures is a sound policy. Loew's, however, for reasons of its own, does not favor such practice. But plaintiff urges that, if the move-over policy is sound and builds the prestige of the picture, why should move-overs be limited to the Lyric and the Pan, which admittedly are inferior theaters as compared with the Terrace in appointments, appearance, and comfort for the patrons? It reasons that it will charge the same admission price as the first-run theater and that the past film rental paid by it to the distributors fully establishes that it could produce as much, if not more, revenue for the distributors and exploit pictures far better because of its superior functional and artistic attributes than is afforded now to the distributors by the present move-over system. It is plaintiff's position that the move-overs to the Lyric and the Pan actually damage the potential earnings of the pictures, and in support of its position, it submits certain computations of its gross receipts on move-over pictures as compared to nonmove-over pictures. Defendants' computations, however, reflect an entirely different result, and on the group of pictures assembled by the defendants and which were played at the Terrace, the results reflect that the exploitation of the move-over pictures actually redounded to plaintiff's benefit by increasing its gross receipts as compared with the gross receipts on nonmove-over pictures. However, it does not seem necessary for the Court to iron out the many conditions and considerations which enter into such comparisons in deciding this controversy. It is true, as plaintiff suggests, that a mere comparison of the gross revenues from a selected list of move-over and nonmove-over pictures shown at the Terrace may be misleading. The type of picture, the time of the year, the weather, the public interest in the picture, and other factors must be considered in making such comparisons. That there are, however, many pictures which are exploited by a move-over to the advantage of the suburban theaters, includ-

ing the Terrace, seems reasonably free from doubt.

During the period in controversy, the Terrace played 21 pictures which had moved over to the Century; 22 pictures which had moved over to the Pan; 17 pictures which had moved over to the Lyric; 3 pictures which had moved over to the World; and 12 pictures which had moved over to the Pix. The Terrace during this period had played 314 pictures; 75 or 76 of them had had move-overs. It should be pointed out, therefore, that during the period in controversy there have been comparatively few move-overs to the Lyric and the Pan which were subsequently played at the Terrace. Only 11 move-overs to the Lyric and the Pan were played by the Terrace in 1954.

There is no established policy with reference to move-overs. That determination depends upon the response that the particular picture receives on a first run. The evidence indicates that the move-overs to the Lyric and the Pan are intermittent and unpredictable, and are entirely a different type of move-over than that which is demanded by the plaintiff. No one questions that a first-run house has the right to waive the clearance that the distributor grants it. And it is only natural that a waiver is granted when the move-over will not particularly harm the first run. Plaintiff's demand for the right to obtain move-overs on all pictures would be disastrous to the first-run theaters. Not only would the move-over necessarily be advertised by the Terrace during the first run, but such a plan would completely obliterate the entire clearance system now accorded the first-run theaters.

No one asserts that clearances and runs are illegal per se. Chorak v. RKO Radio Pictures, 9 Cir., 196 F.2d 225. And no exhibitor has the absolute right to compel a distributor to grant it an earlier run. Loew's, Inc., v. Cinema Amusements, 10 Cir., 210 F.2d 86, 92. Although plaintiff is not seeking a first run, it apparently recognizes that the

first-run downtown houses are entitled to a reasonable clearance, at least with respect to all other suburban houses. No one contends that there should be simultaneous releases to all theaters of all pictures released by the distributors. Not only would this be physically impossible, but such a practice would render the distribution of motion pictures utterly chaotic.

 In considering the claim of plaintiff herein, either as a demand for a move-over run or an exclusive run, we must commence with the premise that on this evidence there is an absence of persuasive testimony that the 28 day clearance for first-run theaters over second-run suburban theaters is unreasonable. All of the suburban theaters in Minneapolis and its environs are in substantial competition with the downtown theaters. Plaintiff decries the theory of the distributors that downtown houses alone should have the show-case runs. Nevertheless, on the showing herein, the Court must recognize that there is substance to the position of the distributors that, if there is to be a parade to advertise a show or a circus, one would not arrange for such a parade out in the suburbs. Moreover, there are certain practical aspects of the problem which cannot be thrust lightly aside, as plaintiff assumes to do. Obviously, the first-run theater must consent to the move-over. No first-run theater would consent to a move-over on a picture without any clearance to a suburban house. If a distributor made such an arrangement with a suburban house, there would not be any first-run houses which would buy the picture for first run. Realistically, therefore, what plaintiff is demanding is the abolishment of any clearance between the first run of a picture and its suburban run at the Terrace. But, if the clearance is waived on certain pictures with respect to the Lyric and the Pan, why, asks plaintiff, should not clearance be waived to a superior theater with as great, if not greater, box-office potentialities and film rental? However, plaintiff apparently fails to recognize that, with all the architectural beauty and advantages to the patron to be found at the Terrace, it nevertheless remains a suburban theater located in an area of small and modest homes outside the corporate limits of Minneapolis. There are at least several other well-appointed, attractive suburban houses in the Minneapolis metropolitan area which would be entitled to the same run as the Terrace. These other theaters are equipped with cinemascope, comfortable seats, and adequate means to display pictures to the patron's enjoyment and interest as fully as the Terrace is able to do. And it is no answer for plaintiff to state that because of the superiority of the Terrace as a theater and its ability to pay more film rental, it is entitled to a suburban monopoly. Other suburban houses not in substantial competition with the Terrace could not be deprived of the same run regardless of plaintiff's ability to outbid them for pictures in competitive bidding. Stripped, therefore, of many extraneous considerations, plaintiff is seeking a decree of this Court which would abolish in favor of the Terrace, and the Terrace alone, any clearance which is now accorded to the first-run houses.

Plaintiff contends that a picture is cheapened because of its exhibition on a move-over run in inferior and nonmodern downtown theaters. But both the Lyric and the Pan, while not new and not comparable in beauty or design to the Terrace, nevertheless afford their patrons cinemascope pictures with all the modern equipment to permit patrons full and complete enjoyment of the pictures. Whatever impact the first-run and move-over competition may have on the suburban theaters stems from the fact that a certain percentage of motion picture habitues will not await the showing of a hit picture in a suburban theater. And if the Terrace were accorded a suburban monopoly on move-overs, depletion of earnings undoubtedly would ensue to the other suburban theaters and to first-run theaters, and in addition it would demoralize the entire scheme of clearances

and create havoc in the distribution of films in the Minneapolis area.

Furthermore, the fact that move-overs have been accorded to the Lyric and the Pan does not establish any right upon the part of the Terrace to a similar run. If the 28 day clearance over second-run suburban houses is reasonable, and the evidence fully establishes that premise, the Terrace has no substantial basis for complaint, whether the first run is extended in the first-run house or at sporadic instances in two downtown theaters where both of the theaters are under the control of the same management. The clearance period is not extended thereby because the 28 day availability commences at the end of the run in the first-run house. That an extended run in a first-run house or a move-over run may deplete the patronage in suburban theaters always may be possible. But there also is convincing evidence here that an extended or move-over run builds a picture, and the suburban theaters are aided in their box-office gross receipts rather than injured thereby. Moreover, if certain pictures are shown on move-over or first runs which attract so many patrons that a suburban theater is deprived of certain patronage, such as result is the inevitable impact of a competitive industry.

The distribution and allocation of motion pictures to theaters will always present a difficult and delicate problem. Courts should be hesitant to disrupt an established system of runs and clearances in absence of convincing proof that its genesis is the result of conspiratorial connivance, and that it is unreasonable. Every theater owner would prefer to have an earlier exhibition date. The distributors no doubt are eager to obtain not only the best pictures, but to exploit them so as to obtain the greatest film rental. The entire record is impelling that each of the distributors here has a bona fide belief that its first-run releases and move-overs should be shown only in the Minneapolis loop. Their determination in that regard is the result of individual action and not by concert of action. That plan of exploitation may change as the city expands into distinct community centers sufficient unto themselves, but the evidence does not indicate that that time has arrived as yet in the Minneapolis area. Minneapolitans still go downtown for their principal shopping and entertainment. And with the transient trade and the large number of local residents who naturally troop downtown for their entertainment, it cannot be gainsaid that the patronage of the downtown theaters continues to be the source of the build-up of the pictures and the bulk of the revenue for the distributors of motion pictures. The Terrace, for instance, does not offer matinees, and the attendance there is almost entirely the automobile trade. Matinee attendance at the defendant exhibitors' downtown theaters in Minneapolis averages about 37 per cent of their total attendance. There are no other attractions in the vicinity of the Terrace which would normally cause people to gather in that particular area. Transit facilities from various parts of the city are too inadequate to bring many patrons by that mode of transportation. Although the Terrace does draw patrons from various parts of Minneapolis, the large source of its attendance is within a two-mile radius of that theater.

Plaintiff contends that there is a conscious parallelism of action here which is evidence at least of a conspiracy among the defendant distributors and defendant exhibitors to favor the downtown circuit theaters. It emphasizes that each of the distributors dogmatically refuses to grant any suburban theater a move-over. However, it may be observed that such refusal also includes the Uptown, a so-called M.A.C. circuit suburban theater, situated in a far better location for a show-case run than the Terrace. The Uptown is not as modern and beautiful a theater as the Terrace, nor does it produce as high a box-office gross or pay as much film rental, but nevertheless it is a fine, attractive suburban theater situat-

ed near the corner of Hennepin and Lake, which are both busy retail streets.

It is the Court's opinion that the evidence fairly establishes that the distributors, without any concert of action, have concluded individually, separately, and independently of each other, that the first runs and move-overs should be confined to the downtown area. They believe that the so-called show-case runs downtown build a picture and that the public become motion-picture minded with reference to a picture by the advertising of the downtown runs and the length of these runs. The fact that the first-run theaters have permitted move-overs in the past in favor of downtown theaters unaffiliated with them does not buttress plaintiff's position herein. Rather, it tends to negate the charge of collusiveness between the distributors and the defendant circuit exhibitors. Move-overs have always been confined to downtown theaters and presumably under circumstances and conditions which were not adverse to the interests of the first-run theaters. It should be emphasized again that, upon the fulfillment of plaintiff's demands herein, the defendant distributors could not escape granting the inevitable requests which would be forthcoming from several suburban theaters for the same consideration.

■ There is no inference of conspiracy under the facts herein merely because of similar views of the defendant distributors and exhibitors on move-overs, or because each distributor adheres to the 28 day availability after the first run for the suburban theaters. Uniformity of action does not necessarily connote concert of action. And as Judge Yankwich stated in Fanchon & Marco v. Paramount Pictures, D.C., 100 F.Supp. 84, 91, "* * * similarity of action, at times, may be the result not of previous agreement, but of solving an identical situation in a similar manner." The present 28 day availability to second-run theaters has been in existence since 1948. That clearance period conforms, generally speaking, to the availability for second-run suburban theaters in comparable cities throughout the Nation. Conditions vary, however, in different cities. Exhibitors require a uniform and constant flow of pictures from the distributors for their theaters. If a theater is on a certain availability from three or four distributors, it generally demands the same run from other distributors. Manifestly, if the Terrace had been accorded a better run, upon its demands herein, from several of the distributors, it would expect that all of the other distributors should likewise adhere to that particular run. The present clearance system in Minneapolis is not necessarily static. The increasing relative importance of suburban theaters and the growth of suburban centers may bring about a change in runs and clearances in the near future. However, on this record the Court should not attempt to hasten that change by the interjection of any premature experimental innovations as suggested by plaintiff. But plaintiff urges that the distributors are blind to their own financial advantage in refusing the Terrace a move-over run, and it asserts that the Court should, by an appropriate decree, grant its demands and that such action would redound to the distributors' own good. Well, even though the distributors are lacking in good business acumen in not recognizing the box-office advantages to them in according the Terrace a preferred run, this Court in absence of sufficient evidence of a conspiracy between the distributors and the defendant circuit exhibitors, is helpless to direct the former on the right path. If plaintiff's analysis of the situation is correct and the expanding population of our American cities, including Minneapolis, requires a new conception of runs and clearances, then the Court must leave the distributors to face the inexorable results which always follow poor business judgment.

No good purpose will be served in discussing in detail the various criteria set forth in the Paramount cases, United States v. Paramount Pictures, D.C., 66

.F.Supp. 323, 343; Id., 334 U.S. 131, 145–147, 68 S.Ct. 915, 92 L.Ed. 1260, as considerations for determining clearances. Suffice it to say that, on this showing, the Court concludes that plaintiff has not established that the runs and clearances in Minneapolis and its environs, including move-over practices as to the Terrace, are the result of a concert of action of these defendants in violation of the anti-trust laws of the United States, and that the evidence does not sustain a finding that the restrictions imposed by the defendants upon the Terrace Theater as to move-overs or as to a more favorable availability are unreasonable.

■ There remains to be considered the relevancy of the Paramount decrees, which the Court admitted in evidence subject to a motion to strike. The conspiracy in the Paramount case existed in 1945 and the decree was signed on June 25, 1948. The Terrace was not in existence during the period of time covered by that conspiracy. The issues involved here were not determined in the paramount case. Here we have a local situation which has no relationship to the so-called Paramount conspiracy. In other words, there is no connection between the local practice of move-overs or clearances in Minneapolis and the issues resolved in the Paramount case. To urge under the circumstances disclosed by this evidence that the past proclivities of the distributors to unlawful conduct in a period antedating the period in controversy here be considered as evidence of a conspiracy would be, as Judge Hastie stated in his dissent in Milgram v. Loew's, Inc., 3 Cir., 192 F.2d 579, 594, 595, "alien to our conception of fair trial." In this litigation, at least, we are concerned with what defendants are doing today and not with the period covered by the Paramount decrees. Moreover, it is the Court's view that in giving due weight and effect to the Paramount decrees the conclusions reached herein would be the same.

It follows from the foregoing that it will not be necessary to discuss the question of damages and that judgment will be for the defendants. Findings of fact and conclusions of law consistent herewith may be presented upon ten days' notice to the plaintiff. An exception is reserved.