**ORBO THEATRE CORPORATION,**
Plaintiff,

v.

**LOEW'S, Incorporated, et al., Defendants.**
**Civ. A. No. 840–56.**

United States District Court
District of Columbia.

Dec. 4, 1957.

Joseph G. Dooley, Joseph A. Lynott, Jr., Washington, D. C., for plaintiff.

John F. Caskey, William R. Glendon, Joseph Childs, Washington, D. C., for defendants.

HOLTZOFF, District Judge.

This is the trial of a private civil action for an injunction and triple damages based on an alleged violation of the antitrust laws. Since no jury was demanded, the trial was by the Court alone. Accordingly, at the opening of the trial, the Court directed that the issue of liability be heard first and announced that if the plaintiff prevailed the trial would be resumed for the purpose of ascertaining the amount of damages, if any. The trial on the issue of liability having been concluded, this opinion deals with that subject.

This action is brought by the lessee and operator of a motion picture theater in Rockville, Maryland, against a number of motion picture producers and distributors. The plaintiff complains that it is the practice of the defendants to withhold the relase of motion pictures to the plaintiff's theater until after the expiration of a waiting period of twenty-one days following the completion of their premiere showing in Washington, D. C. It is contended that this course is illegal as a violation of the Sherman Act. The complaint prays for an injunction against the continuation of the alleged conspiracy and for triple damages.

Section 3 of the Sherman Act, 15 U.S.C.A. § 3, under which this action was brought, provides as follows:

"Every contract, * * * or conspiracy, in restraint of trade or commerce in * * * the District of Columbia, or in restraint of trade or commerce between * * * the District of Columbia and any State

or States * * * is declared illegal."

Section 4 of the Clayton Act, 15 U.S.C.A. § 15, which permits a suit to be maintained by any person who has been injured by a violation of the Sherman Act, reads as follows:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

The following facts appear from the evidence. All of the defendants, with the exception of United Artists Corporation, are producers and distributors of motion picture films. The defendant, United Artists Corporation, is a distributor of pictures originated by various producers. Distributors are engaged in the business of renting motion picture films for public showing on specified dates by exhibitors, who own or operate motion picture theaters. It would be manifestly impracticable, and even tend to create chaos, to throw the product on the market for contemporaneous use in all theaters in the country or even in the same vicinity. The general usage of distributors is, therefore, to begin the circulation of a new picture by first renting it to a large centrally situated theater in several selected localities, and then after its showing is completed in that theater and after the lapse of a specified waiting period, to rent the film to smaller theaters in the same general area. The practice is not to show a picture simultaneously at two competing theaters. Frequently competing houses are accorded an opportunity to bid for an available picture, which is then awarded to the exhibitor submitting the most favorable proposal.

In the District of Columbia the exhibition of a new motion picture is com-

menced by renting it to one of the big theaters in a congested spot in the city of Washington. Most of these theaters are located on F Street in the downtown business district. Then after the "first run", as it is colloquially called in the industry, is finished, the picture is rented to exhibitors operating other theaters in the greater Metropolitan area, which includes nearby Maryland and Virginia as well as Washington.

Ordinarily, a separate contract is drawn for the showing of each individual picture. Contracts with the so-called "first run" theaters commonly contain a negative covenant to the effect that the picture is not to be released for exhibition to any other theater until after the expiration of a specified waiting period subsequent to the close of the first showing. In the jargon of the trade this waiting period is known as a "clearance". In Washington and surrounding areas in Maryland the clearance period generally adopted is three weeks after the end of the first showing. In Alexandria, Virginia, which is close to Washington, on the south bank of the Potomac River, the period commonly used is fourteen days after the close of the first exhibition in Washington. It is contended by the defendants that such negative covenants are indispensable for the protection of the first exhibitors against undue inroads by competition. It is claimed that if a film were released to neighborhood theaters either simultaneously or immediately following its first showing, many potential customers, who would otherwise view the picture at the first run theater, would wait until it reached their neighborhood houses. It is customary for theaters to publicize a picture at least a few days before its exhibition commences and unless there were an interval such as has been described above, neighborhood theaters would be advertising the picture while it was still being shown at a centrally located, large theater and thereby adversely affect the patronage of the latter. By the same token, it is to the best interests of distributors to cooperate with the first run houses in obtaining as large an attendance as possible at the first exhibition. The rental charged for a picture is ordinarily not a flat sum, except for old films, but a percentage of the gross receipts. The percentage exacted is generally higher on the first display than it is on the subsequent neighborhood exhibitions. Moreover, the theaters utilized for premiere showings usually have a greater seating capacity and charge higher admission prices than the others. Consequently, a large proportion of the income of distributors is derived from first run displays, and a relatively smaller percentage from later local exhibitions. These are legitimate business considerations.

Each of the defendants has a head office in New York, and also maintains a regional or branch office in Washington, to serve the District of Columbia, Maryland, Virginia, and parts of West Virginia and Delaware. All contracts for the exhibition of films in this territory are negotiated through the Washington office and the films are shipped from there to the various theaters. Apparently the business is conducted in a highly centralized manner, because all contracts are approved or confirmed in New York, and all clearance periods are ratified by the head office. Unquestionably, therefore, the defendants are engaged in commerce in the District of Columbia, as well as in commerce between the District of Columbia and a State or States, and, therefore, their transactions are within the cognizance of the Sherman Act.

It is desirable to visualize the relative geographic locations and distances of the places involved in this action. Rockville is a small town with a population of between twenty and twenty-five thousand and is the county seat of Montgomery County, Maryland. It is situated about fifteen miles north of F Street, Washington, D. C., and about nine miles north of the northern boundary line between the District of Columbia and Maryland. The town of Bethesda is situated to the northwest of Washington;

immediately adjoining the boundary between the District of Columbia and Maryland. Rockville lies seven miles in a general northerly direction from Bethesda. Immediately northeast of Washington and likewise adjacent to the northern boundary of the city, is Silver Spring. Bethesda and Silver Spring each have two motion picture theaters. North of Silver Spring and about on the same latitude as Rockville, lies the town of Wheaton, on the western outskirts of which is located the Viers Mill Theater. Alexandria, Virginia, lies southeast of Washington on the south bank of the Potomac, about seven or eight miles away. Several theaters are found in Alexandria, which is a city of considerable size. A twenty-one day clearance has been maintained between the first run theaters in Washington and all other theaters in the District of Columbia, as well as those in Bethesda, Silver Spring, Wheaton and Rockville. A fourteen-day clearance has been applied to Alexandria.

Prior to the time involved in this action, there had been established in Rockville a motion picture theater known as the Rockville Drive-In which, as its name indicates, is a theater catering to motorists. There was also a small deteriorated theater in Rockville, known as the Milo Theater. In the fall of 1955, the plaintiff purchased the Milo Theater, and renovated and remodeled it at considerable expense. New seats and new sound and projection apparatus were installed. Its name was changed to the Villa Theater. It opened for operation under the new management on December 1, 1955.

About a month previously to the opening of the Villa Theater, the plaintiff wrote similar letters to all of the defendants, requesting that pictures be furnished to the Villa on a fourteen-day clearance. It was contended that the new theater was entitled to clearance and "protection" over the Drive-In Theater, since the latter operated only during nine months of the year, while the Villa planned to be open the year round.

None of the letters gave any indication that an identical demand was being made on anyone else. This request posed a problem for the distributors. The Drive-In Theater is commodious, has a considerable capacity, and was in successful operation. To have yielded to the demand would have been to discriminate against the Drive-In Theater. Moreover, pressure on the part of theaters in Bethesda, Silver Spring and Wheaton for similar treatment and, therefore, a reduction of the twenty-one day clearance to a fourteen-day clearance could reasonably be anticipated in the event that the request of the Villa were granted. In turn, there was a possibility of repercussion from neighborhood houses in Washington.

Each of the defendants, with the exception of Warner Brothers, in the course of the ensuing two or three weeks replied to the plaintiff pointing out some of the above-mentioned considerations and declining the request. Each of these distributors, however, offered to institute a system of competitive bidding as between the Rockville Drive-In Theater and the Villa Theater during the parts of the year when the Drive-In Theater was in operation, and to supply pictures to the Villa on a twenty-one day clearance during other periods. The defendant Warner Brothers replied by a note offering to discuss the matter orally with the plaintiff's representative at his convenience. A system of competitive bids on the basis of a twenty-one day clearance was actually initiated and put in operation as between the Villa and the Rockville Drive-In Theater on the part of all of the distributors except Universal. The latter had no dealings with the Villa.

On February 25, 1956—less than three months after the Villa Theater opened—this suit was filed. The amended complaint alleges that by concerted action and agreement among themselves, the defendants restricted the release of motion pictures to the plaintiff for unreasonable periods of time, and that this course of action constituted a conspiracy

in restraint of trade. It is further averred that the plaintiff suffered a loss of substantial profits, which it otherwise would have gained except for the alleged unlawful conduct of the defendants. The amended complaint prays for an injunction against the continuance of the conspiracy, for judgment directing the defendants to rent motion pictures to the plaintiff simultaneously with the premiere exhibitions in Washington, and for damages in the sum of $660,000, representing actual damages in the sum of $220,000, trebled as provided in the Sherman Act. It will be observed that while the original demand prior to the institution of suit was for a release of pictures fourteen days after the termination of the first showing in Washington, the relief sought in the complaint comprises a judgment that would direct the defendants to furnish pictures to the plaintiff simultaneously with the first run houses in Washington. On March 28, 1956, the defendant Universal Film Exchanges, Inc., wrote a somewhat brusque letter to the plaintiff protesting against the filing of the suit and stating that Universal would not do business with the Villa.

We must now revert to a further discussion of the replies received by the plaintiff to its original demand. At the trial the plaintiff called as witnesses the Washington branch managers of all of the defendants. The defendants then called as witnesses those of their officials at their home offices, who participated in the decision to reject the plaintiff's demand. Several of the defendants had consulted their house counsel before responding, and each of these house counsel was also called as a witness by them. All of these witnesses, whether called by the plaintiff or the defendants, testified in reply to appropriate questions that they acted without consultations or communication, direct or indirect, with any of the co-defendants. They were subjected to a searching and skillful interrogation on the part of able counsel for the plaintiff, but their testimony was not weakened and their credibility was not impeached. Their testimony remained uncontradicted. There was no evidence, direct or circumstantial, oral or documentary, from which an inference of even remote cooperation among the defendants in this matter could be derived.

The fact that parallel action was taken by alleged conspirators may under certain circumstances justify the Court in drawing the conclusion that the parallel action was concerted action. Such an inference is permissible, but is not compelled.[1] Whether to reach it in any particular case depends on the remainder of the evidence and the surrounding circumstances. Parallel action may indeed be concerted action, but it may also be due to the fact that the persons concerned arrived at the same simple solution of a common business problem. Here the problem was a comparatively simple one, and the solution reached was more or less obvious. If the various officers and employees involved in the decision refrained from testifying on this point, the court might well draw

1. Theatre Enterprises v. Paramount Film Dist. Corp., 4 Cir., 201 F.2d 306, 314, affirmed 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273; Robbinsdale Amusement Corp. v. Warner Bros. P. Dist. Corp., D.C.D.Minn., 141 F.Supp. 134; G. & P. Amusement Co. v. Regent Theater Co., D.C., 107 F.Supp. 453, affirmed 6 Cir., 216 F.2d 749; Windsor Theatre Co. v. Walbrook Amusement Co., D.C.D.Md., 94 F.Supp. 388; Fanchon & Marco v. Paramount Pictures, Inc., D.C., 100 F.Supp. 84, affirmed 9 Cir., 215 F.2d 167.

The case of Milgram v. Loew's Inc., D.C., 94 F.Supp. 416, affirmed 3 Cir.,

192 F.2d 579, on which the plaintiff relies, is distinguishable. In that case the trial judge, after hearing all of the evidence, reached a conclusion as a matter of fact that there was concerted action. The Court of Appeals in affirming the judgment pointed out, however, that mere parallel business practices of themselves are not necessarily sufficient evidence of concerted action (at page 583). Moreover, in that case the conspiracy charged a refusal to treat Drive-In Theaters on the same basis as other theaters for purely arbitrary reasons.

an adverse inference. On the other hand, considering the fact that there was absolutely no evidence of the alleged conspiracy, beyond the taking of parallel action; that each of the participants denied any communication or consultation with any of the co-defendants; and that none of the witnesses was in any way impeached or gave any testimony that was inherently incredible, several of them being members of the bar, the Court is not justified in finding that the actions were jointly planned or concerted. In fact, the Court cannot do so without also reaching the conclusion that some of these witnesses testified falsely. There is, however, no basis for ascribing such reprehensible action to any of them. The Court, therefore, concludes that the plaintiff did not establish by a preponderance of the evidence that there had been a conspiracy on the part of the defendants to exercise an undue or illegal restraint against the operations of the Villa Theater.

▐▐ In its endeavors to sustain its claim, the plaintiff sought first to establish a conspiracy, that is an agreement or concerted action on the part of the defendants. Naturally, a conspiracy need not be proved by direct evidence, but may be shown by circumstantial evidence. As indicated above, however, this Court finds as a matter of fact that a conspiracy has not been proved. In addition it is necessary for the plaintiff to establish that the restraint of which it complains was unreasonable. The finding that there was no concerted action among the defendants does not necessarily dispose of the issues, because it is also essential to consider whether there was a conspiracy between the defendants and the first run exhibitors to impose an unreasonable restraint as against neighborhood houses.

▐ As part of its proof to establish a conspiracy, the plaintiff offered in evidence and relied on the findings of fact and conclusions of law and a series of final decrees in the case of United States v. Paramount Pictures, Inc.,[2] pending in the Southern District of New York. In this connection the plaintiff invoked the provisions of Section 5 of the Clayton Act, 15 U.S.C.A. § 16, the pertinent provisions of which read as follows:

"A final judgment or decree rendered in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any suit or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided,* This section shall not apply to consent judgments or decrees entered before any testimony has been taken."

The purpose of this enactment was to enable the plaintiff in a private antitrust suit to rely on a prior judgment in a criminal proceeding, or in a civil suit brought by the Government, as proof of a conspiracy. In that event, the plaintiff is merely required to show that the conspiracy affected him and that he was injured by it. The object of this salutary legislation was not only to save the time of the courts, for proof of conspiracy in antitrust cases is sometimes very lengthy, but also to assist injured parties by freeing them from the burden of proving a conspiracy, since the cost of such proof may be prohibitive.[3] Such a decree, however, is prima facie evidence only as to matters actually determined and does not extend to all issues that might have been adjudicated.[4]

2. D.C., 66 F.Supp. 323, modified 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260.

3. Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 571, 71 S.Ct. 408, 95 L.Ed. 534; Partmar Corp. v. Paramount Pictures Theatres Corp., 347 U.S. 89, 90, 91, 102–103, 74 S.Ct. 414, 98 L.Ed. 532.

4. Theatre Enterprises, Inc., v. Paramount Film Dist. Corp., 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273.

■■ The defendants in the Paramount case, were producers and distributors of motion pictures. The findings of fact, conclusions of law and a series of decrees adjudicated that the defendants had entered into a nationwide conspiracy in restraint of trade effectuated by fixing admission fees of individual theaters, by a practice known as block booking, by pooling agreements, by so-called "formula deals", as well as by clearances. In other words, clearances were only one feature of the conspiracy. The Court found also, however, that in the distribution of motion pictures it was essential to lease them for exhibition on different dates. The decrees in the Paramount case were made in 1950. The alleged conspiracy, of which the plaintiff complains, to deprive him of pictures except after an unreasonable period of delay, is said to have originated in the fall of 1955. Consequently, it is not the same conspiracy as that found to exist in the Paramount case. It should be emphasized that under the above quoted statute the decree is prima facie evidence only of a conspiracy covering the same area and existing during the same time as that involved in the case on trial.

Thus, it was held in Theatre Enterprises, Inc., v. Paramount Film Dist. Corp., 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273, which involved an alleged conspiracy to impose undue clearances on a theater located in Baltimore, Maryland, that the decree in the Paramount case did not relate to that particular conspiracy and that, therefore, the decree was not prima facie evidence in support of the plaintiff's case.[5]

■ As indicated above, while the Court finds that no conspiracy has been established, it nevertheless must proceed to determine whether the clearance system of which the plaintiff complains constitutes a series of illegal restrictions. We are, therefore, brought to a consideration of the basic principles of the law relating to restraints of trade and specifically to the construction of the Sherman Act.

■ The objective of the Sherman Act was, in large part, to enact into a statute the principles of the common law relating to restraints and monopolies; to render them applicable to transactions in interstate and foreign commerce; and to implement them by effective remedies. The common law, however, did not ban all restraints of trade. It proscribed only unreasonable restraints. Consequently, the Sherman Act has been construed as being applicable only to unreasonable restraints of trade, even though the word "unreasonable" is not found in the statute. In effect, the word "unreasonable" has been inserted by judicial construction.[6]

■ Negative covenants, auxiliary to contracts of sale and employment, were well known and were permitted at common law, provided they were partial in their nature and were reasonably limited in time and place. The test of their validity was whether the restraint was any greater than was necessary to afford fair protection to the party in whose favor they were made, and not so extensive as to interfere with the interests of the public. Such covenants could be included in a contract solely to protect one of the parties from the injury that he might suffer from unrestrained competition. The very purpose of the contract and the surrounding circumstances suggest the measure of protection needed and furnish a standard by which the legality of the restraint may be tested. This entire subject is elaborately discussed in the classic opinion of Taft, as Circuit Judge, in United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 281, 282, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136.

---

5. See also Robbinsdale Amusement Corp. v. Warner Bros. P. Dist. Corp., D.C.D. Minn., 141 F.Supp. 134.

6. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663.

These basic principles are applicable to so-called clearances in the distribution of motion pictures. Clearances are nothing more than a modern form of a negative covenant to refrain for a limited period and in a circumscribed territory from selling or leasing to anyone else the same property as that sold or leased to the other party to the contract, in order to protect the latter against unrestricted competition. Consequently, clearances contained in contracts for the rental of motion picture films, i. e., negative covenants not to lease the same picture to potential competitors until the lapse of a certain period after the termination of the prior showing, are valid if reasonably limited as to time and area.

Thus, in the leading case of United States v. Paramount Pictures, 66 F. Supp. 323, at page 341, modified 334 U. S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, on which plaintiff relies and which has been discussed above, it was said:

"Such provisions are no more than safeguards against concurrent or subsequent licenses in the same area until the exhibitor whose theatre is involved has had a chance to exhibit the pictures licensed without invasion by a subsequent exhibitor at a lower price. It seems nothing more than an adoption of the common law rule to restrict subsequent exhibitions for a reasonable time within a reasonable area."

This view was approved by the Supreme Court in its opinion, which modified the decree as to some other features. Reasonable clearance or waiting periods in the distribution of motion pictures have been upheld in numerous cases.[7] For example, in Theatre Enterprises v. Paramount Film Dist. Corp., supra, a twenty-one day waiting period in favor of down-town theaters in Baltimore, as against a neighborhood theater in a residential section of the city, was held valid. A similar clearance period used in Los Angeles, was upheld in Fanchon & Marco v. Paramount Pictures, Inc., supra.

The case of Gary Theatre Co. v. Columbia Pictures, 120 F.2d 891, involved a practice of according the privilege of a first run to Loop Theaters in Chicago, followed by a three-week waiting period as to other theaters in that city, and then releasing the pictures to theaters in Gary, Indiana, only after the second series of exhibitions in Chicago were concluded. These restraints were held reasonable and valid as against theaters located in Gary. Numerous other examples of this kind might be adduced, but it seems an unnecessary multiplication of authorities to do so.

It may be argued with some degree of cogency that a fourteen-day waiting period would be sufficient in the case at bar, because that is the limitation invoked as against theaters located in Alexandria, Virginia. The Court may not, however, substitute its own judgment for the business judgment of the parties. All that it may determine is whether the negative covenants actually used are beyond the bounds of reasonable restrictions. It may not decide whether a lesser restraint might possibly be sufficient. The Court may not undertake to dictate to the management of business concerns how to conduct and operate their enterprises, but is confined to deciding whether what they are actually doing transcends the law.

The following apt remarks made on a similar point in Robbinsdale Amusement Corp. v. Warner Bros. P. Dist. Corp., 141 F.Supp. 134, 141, are applicable to the instant case:

7. Theatre Enterprises v. Paramount Film Dist. Corp., 4 Cir., 201 F.2d 306, 314, affirmed 346 U.S. 537, 74 S.Ct. 257, 98 L. Ed. 273; Dipson Theatres v. Buffalo Theatres, 2 Cir., 190 F.2d 951; G. & P. Amusement Co. v. Regent Theater Co., D.C., 107 F.Supp. 453, 459, affirmed 6 Cir., 216 F.2d 749; Windsor Theatre Co. v. Walbrook Amusement Co., D.C.D.Md., 94 F.Supp. 388; Fanchon & Marco v. Paramount Pictures, Inc., D.C., 100 F. Supp. 84, affirmed 9 Cir., 215 F.2d 167; Westway Theatre v. Twentieth Century Fox, D.C.D.Md., 30 F.Supp. 830; Gary Theatre Co. v. Columbia Pictures, 7 Cir., 120 F.2d 891.

"The distribution and allocation of motion pictures to theaters will always present a difficult and delicate problem. Courts should be hesitant to disrupt an established system of runs and clearances in absence of convincing proof that its genesis is the result of conspiratorial connivance, and that it is unreasonable."

Under the circumstances, the Court concludes that the restraints imposed in the case at bar are valid.

There is still another approach to the fundamental issues in this case. A person engaged in the manufacture or sale of goods, or in rendering services, is under no obligation to sell to everyone who applies, or to serve everyone who desires to deal with him. The only exception relates to callings coupled with a public interest. Dealers and manufacturers may use their own judgment and discretion and select persons with whom they choose to do business as well as the time when they will enter into transactions with them. Thus, in United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, it was stated that in the absence of any purpose to create or maintain a monopoly, the Sherman Act does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. A business concern may sell its product to one customer in preference to others, when acting without ulterior motives and free from compulsion. No person is required to sell to all comers, unless he is engaged in a business coupled with a public interest.[8]

In Paramount Pictures Theatres Corp. v. Partmar Corp., D.C., 97 F.Supp. 552, at page 559, affirmed 9 Cir., 200 F.2d 561, affirmed 347 U.S. 89, 74 S.Ct. 414, 98 L.Ed. 532, it was said:

"We are not of the opinion that any theatre has the right, as a matter of law, to demand from a motion picture producer the right of prior runs, any more than the seller of automobiles has the right to demand of the manufacturer an agency within a restricted territory. If the automobile manufacturer has the right to establish an exclusive agency within a restricted area for the sale of its product and to refuse to license any other agency within that restricted area, it would seem to the Court that the motion picture distributor should have the same right and privilege."

The illustration suggested in this quotation is an apt analogy to the situation presented in the case at bar. No automobile dealer may come forward and demand that any particular manufacturer sell its vehicles to him for resale at retail. The practice of automobile manufacturers to designate specified distributors and agents, in some communities on an exclusive basis and in others in a limited number, and of refusing to sell to any other dealer, is well established and is sanctioned by law.[9]

It follows hence that the defendants had a right to refuse to lease any pictures to the plaintiff at all. *A fortiori* they had a right to refuse to rent to the plaintiff except after the expiration of certain waiting periods. The only limitation on this general principle is that the defendants may not conspire among themselves not to deal with the plaintiff. As previously indicated, the Court finds that no conspiracy has been established in this case.

Accordingly, the Court concludes that the plaintiff is not entitled to recover. Judgment will be rendered for the defendants dismissing the complaint on the merits. This opinion will constitute the

8. G. & P. Amusement Co. v. Regent Theater Co., D.C., 107 F.Supp. 453, affirmed 6 Cir., 216 F.2d 749.

9. Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418; Schwing Motor Co. v. Hudson Sales Corp., 4 Cir., 239 F.2d 176.

780

findings of fact and conclusions of law, but counsel, if they so desire, may submit additional proposed findings and conclusions.